### In re WHITE MOTOR CORPORATION, Debtor.

**Misc. No. 84–53.**

United States District Court,
N.D. Ohio, E.D.

Aug. 14, 1984.

---

Henry Rose, Baruch A. Fellner, J. Stephen Caflisch, Lawrence F. Landgraff, Deborah West, Washington, D.C., for Pension Benefit Guaranty Corp.

Irwin M. Feldman, David C. Weiner, Armond D. Budish, Hahn, Loeser, Freedheim, Dean & Wellman, David G. Heiman, Jones, Day, Reavis & Pogue, James H. Woodring, Timothy Sheeran, George Crisci, Squire, Sanders & Dempsey, Cleveland, Ohio, for John T. Grigsby, Jr., Trustee.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This episode in the Chapter 11 reorganization of the White Motor Corporation ("White") raises difficult questions about the jurisdictional boundaries between this Court and the Bankruptcy Court under newly-enacted bankruptcy legislation. The Pension Benefit Guaranty Corporation ("PBGC"), a federal government entity which holds several of the largest claims against the White estate, contends that the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("the Amendments") requires this Court to withdraw the reference of litigation concerning those claims from the Bankruptcy Court. After careful consideration of the statute and its legislative history, this Court determines that the Bankruptcy Court remains the proper forum for initial proceedings concerning these claims, and denies PBGC's motion.

This Court's jurisdiction over the White reorganization now derives entirely from 28 U.S.C. § 1334.

### I.

PBGC is charged with administering the pension plan termination insurance program of Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1301 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980. White, a manufacturer of trucks and other large vehicles, filed for reorganization on September 4, 1980, pursuant to Chapter 11 of the Bankruptcy Reform Act of 1978 ("the 1978 Act" or "the Code"), 11 U.S.C. § 1101 *et seq.* On November 18, 1983, the Bankruptcy Court issued a Confirmation Order, approving White's reorganization plan and transferring all legal title to relevant property, assets and effects of White to a Reorganization Trust, managed by a Disposition Assets Trustee ("the Trustee"). The Trustee also acquired the authority and duty to pursue White Motor's objections to claims against the estate. The present dispute concerns objections by White, later adopted and supplemented by the Trustee, to PBGC's claims against the estate. PBGC seeks to remove adjudication of two groups of claims to this Court. The following summary of the contested issues in the two proceedings is drawn from pleadings submitted by PBGC and the Trustee to the Bankruptcy Court and to this Court.

A. *The Minimum Funding Contributions Claims ("Contribution Claims")*

The first fifteen disputed claims involve six pension plans established, sponsored

and maintained by White for its employees. After filing for reorganization, White terminated the plans under 29 U.S.C. § 1341, and the date of termination was established as November 30, 1981. 29 U.S.C. § 1348. White and PBGC entered into agreements making the PBGC the trustee of the plans. PBGC claims that on the termination date the plans' assets were approximately $60,-000,000 less than the value of the pension payments PBGC must make under ERISA to former White employees and their beneficiaries, and that White owed $17,887,297 in contribution to the plans to satisfy the minimum funding standards of ERISA, 29 U.S.C. § 1082, and the Internal Revenue Code ("IRC"), 26 U.S.C. § 412. For purposes of the current motion, there is no dispute about the amounts owed.

In May of 1982, PBGC as trustee for the plans filed fifteen proofs of claim for unpaid contributions. Six of the fifteen claims concern contributions which were required to be made to the plans during the administration of the estate ("Post-Petition Claims"); PBGC claims that these are administrative expenses entitled to priority under § 507(a)(1) of the Bankruptcy Code. Four claims concern contributions which were required to be made during the 180 days prior to the filing of the reorganization petition ("180-Day Claims"); PBGC claims that these are contributions to benefit plans entitled to priority under § 507(a)(4) of the Code. The remaining claims are unsecured.

On April 7, 1983, White and the official creditors' committee representing unsecured creditors ("Creditors' Committee") filed an Application to Reclassify Certain PBGC Claims ("the Application"). The applicants contended that a substantial portion of the ten secured claims were not entitled to priority status under § 507 and requested that the Bankruptcy Court reclassify them as unsecured claims. On April 26, 1984, the Trustee filed a Supplemental Application to Reclassify Certain PBGC Claims ("the Supplemental Application") which raised additional arguments in support of reclassifying large portions of the alleged priority claims.

Trial on the Application and Supplemental Application commenced in the Bankruptcy Court on June 26, 1984 and continued the following day. In his Trial Brief, the Trustee summarized his case as follows:

The primary issue before this Court is a limited one: whether the ... Post-Petition Claims asserted by the PBGC, as trustee, for unpaid contributions to pension plans should be entitled to treatment as expenses of administration of the estate of White, despite the fact that said contributions were almost wholly attributable to work performed for White *before* the filing of the reorganization petition.... [O]nly a very small portion of the PBGC's ... Post-Petition Claims may be treated as an expense of administering the estate of the debtor-in-possession, and the remaining portion should be reclassified as non-priority. A second but related issue is whether the ... 180-Day Claims are entitled to fourth priority treatment even though only a very small portion of those claims "arises from services rendered within 180 days before the date of the filing of a petition or the date of the cessation of the debtor's business, whichever occurs first." Again, only a very small portion of the ... 180-Day Claims may be entitled to priority.

Although White has generally objected to the PBGC's claims, the Supplemental Application was filed because the priority issues raised by the PBGC's claims are easily isolated from other issues related to the claims and are more manageable from a factual standpoint than the other issues. The priority issues are primarily legal issues that may be resolved based on essentially undisputed facts. At the same time, however, there is in excess of $7 million at stake in the resolution of the priority issues, which amount the Disposition Assets Trustee has been obligated to hold on reserve under White's plan of reorganization. Accordingly, the Supplemental Application fulfills the dual objectives of isolating manageable issues for expeditious and efficient resolution

and providing a facility for the determination of how over $7 million is to be treated and distributed by the Disposition Assets Trustee.

Consistent with the objectives of the Supplemental Application, the dollar amounts asserted in the PBGC's claims are assumed, for purposes of this litigation only, to be accurate. Based upon this assumption, the Disposition Assets Trustee will show at the trial that the maximum possible amount of the contributions entitled to administrative expense priority is approximately $1.35 million for the ... Post-Petition Claims and a small additional amount for the ... 180-Day Claims.

It appears from the PBGC's extremely wide-ranging discovery that the PBGC is likely to attempt to confuse the issue before the Court by making a variety of extraneous arguments. For example, this action does *not* involve: (1) the amount of the unpaid contributions, since the PBGC's priority claims are assumed to state the correct amounts; (2) the assumptions underlying the computations of such amounts; (3) whether certain forms and schedules were filed by White with the Internal Revenue Service; (4) guarantee letter issues which are the subject of other pending litigation; or (5) issues regarding any pension plans other than those six plans, discussed below, which are the subject of the PBGC's priority claims. Any attempts by the PBGC to introduce evidence at trial on any of these extraneous issues will not be relevant to resolution of the reclassification issue and such irrelevant matters should be excluded at the outset of trial.

In its Trial Brief, PBGC stated its position:

The contributions required to comply with ERISA's minimum funding standards for the period for the filing of the petition until the termination of the Plans are "actual, necessary costs and expenses of preserving the estate" and are entitled to priority under 11 U.S.C. § 503(b)(1)(B) and (C).

Under ERISA, White could have terminated the Plans at any time, pre- or post-petition, and fixed its minimum funding obligation as of the date of termination. White was aware that it could terminate the Plans, and also was aware that its funding obligations under ERISA increased every day White continued the Plans. White nevertheless continued the Plan until November 1981.[3] Insofar as White's statutorily-required contributions increased because White continued the Plans after the filing of the petition, priority under Section 507(a)(1) clearly is appropriate.[4]

The Disposition Assets Trustee would limit priority by asking the Court to ignore the fact that the minimum funding standards impose a unitary obligation that increases every day a plan is maintained. Although the Disposition Assets Trustee seeks to treat a portion of the required contribution to each Plan as if it were a pre-petition debt, the Trustee is well aware that if White had terminated the Plans on the petition date, none of the contributions for which the PBGC has claimed administrative priority would have been owed, either as pre-petition or as post-petition obligations. The artificial distinctions on which the Disposition Assets Trustee relies are not supported by ERISA, the Code, or the governing case law. Moreover, the first two alternatives proposed by the Disposition Assets Trustee—limitation of priority either to the amount required to fund post-petition acruals or to "normal cost" calculated on a unit credit basis—ask the Court to endorse a method of calculation inconsistent with the method actually used by the actuary for the Plans in calculating the minimum funding requirements. The Application and the Supplemental Application therefore should be denied.

---

[3] Because White presumably had sound business reasons for continuing the Plans until November 1981, there can be no question that the costs of continuing the Plans are "actual, necessary costs and expenses of preserving the estate." Further, although the PBGC is not obligated to prove specific benefits to the estate

resulting from continuation of the Plans, the PBGC will present such proof at trial.

4 Similar reasoning applies to the claims for which the PBGC has asserted priority under Section 507(a)(4). Accordingly, those claims will not be separately addressed.

### B. *The Guarantee Letter Claims ("Letter Claims")*

The remaining claims covered by PBGC's Motion involve letter agreements ("the Guarantee Letters") entered into between White and the United Auto Workers ("UAW") beginning in 1967. The Guarantee Letters provided for full payment of vested pension benefits to workers with at least ten years seniority at White plants in Cleveland and Exton, Pennsylvania. After filing for reorganization, White terminated the plans. PBGC was appointed statutory trustee of the plans and filed two proofs of claim for approximately $50.6 million. White and later the Trustee contested the claims. The Bankruptcy Court granted partial summary judgment to White, finding that PBGC lacked standing to enforce the Guarantee Letters; the District Court, per Judge Krenzler, affirmed on the same day; and the Sixth Circuit reversed both lower courts. In *Pension Benefit Guaranty Corp. v. White Motor Corp. (In re White Motor Corp.)*, 731 F.2d 372 (6th Cir. 1984), the court found that "White Motor committed itself to making good on all pension benefits earned by its employees with more than ten years seniority, and that commitment must be kept." *Id.* at 375 (footnote omitted). It then held that PBGC "does have the capacity as White Motor's co-debtor to make a proof of claim against White Motor for the amount of pension benefits owed under the guarantee letters which are also guaranteed by the Corporation." *Id.* at 376.

With the Letter Claims again before the Bankruptcy Court, the Trustee argues that PBGC is precluded from filing the claims by the Court's bar date or PBGC's failure to make a timely objection to confirmation of the Reorganization Plan. In the alternative it contests the allowance of the Letter Claims and the status to be assigned to them. The Bankruptcy Court was to hold a final pretrial conference on August 3,

1984, and will commence an evidentiary hearing with respect to the claims on August 29.

### II.

#### A.

On July 10, 1984, President Reagan signed the Bankruptcy Amendments. Title I defines the bankruptcy jurisdiction of the district court and bankruptcy court, sets forth procedures for referral, withdrawal, or appeal of cases from one court to the other, and provides for the appointment of bankruptcy judges.

The Amendments are the long-awaited Congressional response to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) *("Marathon")*, in which the plurality and concurring opinions invalidated the provision of the 1978 Act under which Article I bankruptcy judges were permitted to decide certain state-law actions commenced by the debtor in the Bankruptcy Court. The new statute, the most relevant committee report, S.Rep. No. 55, 98th Cong., 1st Sess. ("Senate Report"), and legislative debate reveal a broad congressional intent to retain as much as possible of the bankruptcy court structure created by the 1978 Act, within the constitutional constraints spelled out in *Marathon.* Unfortunately, as the pending motion reveals, the necessary limitations on bankruptcy court jurisdiction and bankruptcy judges' power "result in construction of a jurisdiction maze that gives up to six different options for where any particular dispute is to be tried." 130 Cong.Rec. H7490 (daily ed. June 29, 1984) (remarks of Rep. Edwards).

#### B.

Title I of the Amendments begins by amending the statutory provision granting bankruptcy jurisdiction to district courts, 28 U.S.C. § 1334, which now provides in part:

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

After provisions concerning bankruptcy venue, courts, judges and salaries, 28 U.S.C. §§ 157–58 set forth the various matters which may be heard by the Article I court and judges, and the mechanisms for review of those decisions by Article III district court judges. Section 157(a) provides generally:

Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

The remainder of § 157 sets forth a two-track relationship between the two courts. Section 157(b) concerns "core proceedings" arising under the Code and provides in relevant part:

(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to—

\* \* \* \* \* \*

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interest for the purposes of confirmation of a plan under chapter 11 or 13 of title 11 ...

\* \* \* \* \* \*

(O) other proceedings affecting the liquidation of the assets estate or the adjustment of the debtor-creditor or the equity security holder relationship ...

The "review under section 158 of this title" referred to under § 157(b)(1) encompasses the traditional standard of appellate review, under § 158(a):

The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

For "non-core" proceedings related to a title 11 case, however, § 157(c) sets forth an entirely different procedure:

(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

Finally, § 157(d) permits the district court to withdraw either core or non-core proceedings from the bankruptcy court on its own motion or upon motion by a party, and sets forth circumstances under which

such a withdrawal is compelled. The provision states:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

## C.

The legislative history provides limited guidance about how to reconcile the withdrawal provisions of § 157(d) with the delegation of both core and non-core matters to bankruptcy courts in §§ 157(b) and (c). Several legislators merely repeated the language of the statute:

> Subsection (d) provides that the district court on its own motion or the motion of a party may withdraw the case o[r] proceeding, in whole or in part; but the district court must grant a motion to withdraw a proceeding if the court determines that resolution involves consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

130 Cong.Rec. S6085 (daily ed. May 21, 1984) (remarks of Sen. Dole).

> This proposal will continue the use of article I bankruptcy judges as an adjunct to the article III district court, except that the jurisdiction and authority of the bankruptcy court would be subject to control and review of the district court and the consent of the parties. "CORE" bankruptcy cases continue to be determined by Article I bankruptcy judges, while "non-CORE" Marathon-type cases could not be finally adjudicated by the bankruptcy judge without the consent of the parties.
>
> The district court may withdraw, in whole or in part, any case referred to the

bankruptcy judge and is mandated to grant a party's motion to withdraw proceedings involving both title 11 and other laws of the United States regulating organizations and activities affecting interstate commerce.

*Id.* at S6087 (remarks of Sen. Heflin).

Scattered in the legislative history, however, are comments providing a slightly clearer indication of the appropriate reading to be given to § 157(d). Discussing proposed language similar to that enacted as § 157(d), the Senate Report stated:

> Unlike the 1978 Act, however, S. 1013 gives the district court far greater control over the handling of all bankruptcy cases and proceedings. Under [the proposal], the district court judge may recall, on its own motion, any case or proceeding referred to the bankruptcy court. Also, a motion for recall of any case or proceeding may be made either by a bankruptcy judge or a party. Recall by the district court is generally discretionary, except that recall is mandatory in two instances—in any proceeding involving a claim or cause of action which is not one arising under title 11; and (2) in any proceeding where the district court determines that Federal laws regulating organizations or activities affecting interstate commerce are involved—the Committee intends that this second instance of mandatory recall be construed narrowly—basically to cover only those organizations or activities which immediately and directly affect interstate commerce.

This recall feature, a major departure from the system established in 1978, will permit a determination by an Article III judge of those matters addressed by the *Marathon* case, primarily as a result of the first mandatory recall category. The district court thus retains full power to withdraw or limit the reference of a bankruptcy case or proceeding to the bankruptcy court at any time for any reason, and is further *required* to recall any *Marathon* issue if requested to do so. A decision by the district court to

recall a case or proceeding would be a non-reviewable decision.

Senate Report at 16.

A colloquy during the House debate on the final version of § 157(d) is also helpful:

Mr. KRAMER:

\*   \*   \*   \*   \*   \*

My question is this: The language "activities affecting interstate commerce" is very broad language. What kinds of situations or circumstances does the gentleman intend to cover here? Or will this language become an escape hatch through which most bankruptcy matters will be removed to a district court?

Mr. KASTENMEIER:

I thank the gentleman for his question.

This language is to be construed narrowly. It would, for example, mean related cases which may require consideration of both title 11 issues and other Federal laws including cases involving the National Labor Relations Act, civil rights laws, Securities and Exchange Act of 1934, and similar laws.

Now, for example, some question arises: Would this affect existing cases involving asbestosis victims against manufacturers? The answer is no. Those are essentially State issues. They are related to the core bankruptcy and will be determined by the bankruptcy judge; they will not be recalled on that basis.

130 Cong.Rec. H1849–50 (daily ed. March 21, 1984).

Finally, during the Senate debate, Senator DeConcini offered a similarly narrow reading of § 157(d):

This provision concerns mandatory withdrawal of proceedings from the bankruptcy judge where the district court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce. *The district court should withdraw such proceedings only if the court determines that the assertion that other laws regulating organizations or activi-*

*ties affecting interstate commerce are in fact likely to be considered, and should not allow a party to use this provision to require withdrawal where such laws are not material to resolution of the proceeding. The district court should refuse withdrawal if withdrawal would unduly delay administration of the case, considering the status of the case, the importance of the proceeding to the case, and the relative caseloads of the district court and bankruptcy judge.*

130 Cong.Rec. S6081 (daily ed. June 19, 1984) (emphasis added).

### III.

A.

PBGC originally raised two arguments in support of its motion to withdraw reference. It contended first that § 157(d) compelled a withdrawal, since

The PBGC's contribution claims are based on the minimum funding standards prescribed by ERISA and the IRC, and the primary issue with respect to the priority of the contribution claims is the extent to which the contributions required to comply with the minimum funding standards for the period from the filing of the petition until the termination of the Plans are "actual, necessary costs and expenses of preserving the estate" and are entitled to priority under 11 U.S.C. § 503(b)(1)(B) and (C). Similarly ... the PBGC's standing to assert the Guarantee Letter claims, as well as the amount of the claims, is based on the PBGC's role as statutory guarantor of the pension benefits under Section 4022 of ERISA, 29 U.S.C. § 1322. Thus, it is beyond peradventure that resolution of the issues raised by PBGC's claims necessitates a consideration of ERISA and the IRC as well as of the Bankruptcy Code (title 11). Finally, it is obvious that ERISA and the minimum funding standards of the IRC (which were added to the IRC by Title II of ERISA) are laws of the United States regulating organiza-

tions or activities affecting interstate commerce ....

PBGC Brief at 14.

Second, PBGC cited recent statements by the President and the Director of the Administrative Office of the United States Courts which expressed concern that § 121 of the Amendments may be unconstitutional. Without itself contending that the Amendments are unconstitutional, PBGC suggested that

> ... whatever the merits of the arguments regarding the constitutionality of Section 121 ..., it is apparent that ... to conduct proceedings in reliance upon the provision carries "an inherent risk of propelling citizens relying upon judicial authority into unnecessary litigation." ... The interests of the parties, as well as the public interest and judicial economy, would be ill-served by the failure to withdraw the reference of the PBGC proceedings to a bankruptcy judge purporting to exercise authority under section 121.

*Id.* at 14–15 (citation omitted).

The Trustee responded with three arguments. Focusing on § 157(d), he argued that the provision only applies to "non-core proceedings", that "it applies only if consideration of a non-bankruptcy federal law regulating interstate commerce is *required for resolution of the proceeding*", that applying § 157(d) to "core proceedings tangentially involving non-bankruptcy federal law" would bring a "flood of proceedings into the district courts ..." Trustee Brief at 11–15. Applying those principles to the disputes with PBGC, he found the Contribution Claims and the Letter Claims to be core proceedings whose resolution depends solely on interpretation of Code provisions. Furthermore, the Trustee contended that, notwithstanding the brief time that elapsed between passage of the Amendments and the filing of the PBGC motion, the motion was not timely filed and "withdrawing the reference ... at this late date would severely prejudice the ... Trustee and entail a waste of judicial resources as well." *Id.* at 23.

The Trustee's second argument proceeded along similar lines to urge that the potential waste of time and resources compels this Court not to apply § 157(d) to the PBGC claims "when manifest injustice would result from such a withdrawal." *Id.* at 24. Finally, he asked this Court not to presume, without deciding, that the 1984 Amendments are unconstitutional. *Id.* at 31.

At oral argument, counsel agreed on certain general propositions: that ERISA and the IRC are "laws of the United States regulating organizations or activities affecting interstate commerce" within the meaning of § 157(d); that the Contribution Claims and the Letter Claims are "core proceedings" within the meaning of § 157(b) and cannot be heard by the Bankruptcy Court under the "non-core" procedures of § 157(c); and that in its motion PBGC had not indicated what ERISA or IRC questions must be decided to resolve the two sets of claims. Both sides then submitted additional briefs.

B.

█ Three points made in PBGC's reply brief are indisputably correct. First, § 157(d) cannot be limited to "related proceedings". As indicated by the references in the legislative history to the National Labor Relations Act,[1] § 157(d) must be read as a reaction to both *Marathon* and *National Labor Relations Board v. Bildisco and Bildisco*, —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)—a case involving the Code and another federal interstate commerce statute. Looking to the text and history of § 157(d), it must be concluded that the withdrawal mechanism is clearly applicable to core proceedings as defined by § 157(b).

█ Second, PBGC's motion was timely filed. A pleading filed eight days after the enactment of § 157(d) and two days after the judges of this Court issued General Order No. 84 (N.D. Ohio July 16, 1984) (referring all pending bankruptcy matters

---

**1.** *See* Part II–C, *supra* (remarks of Rep. Kasten-   meier).

to former bankruptcy judges)[2] cannot be deemed untimely; the cases cited by the Trustee involve vastly different fact patterns and are inapposite.

■ Third, withdrawal of the reference with respect to PBGC's claims would not result in "manifest injustice". Both sides agree that the controlling Sixth Circuit case is *Harper-Grace Hospitals v. Schweiker*, 691 F.2d 808, 811 (6th Cir.1982), where the court stated:

> Because this new legislation became law while this appeal was pending, we must also indicate why it is applicable. The general rule is that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board*, 416 U.S. 696, 711 [94 S.Ct. 2006, 2016, 40 L.Ed.2d 476] (1974); *Scarboro v. First American National Bank of Nashville*, 619 F.2d 621 (6th Cir.1980) [*cert. denied*, 449 U.S. 1014, 101 S.Ct. 572, 66 L.Ed.2d 472 (1980) ].[3]

The Trustee relies on *Lawrence v. Staats*, 665 F.2d 1256 (D.C.Cir.1981), and *In re District of Columbia Workmen's Compensation Act*, 554 F.2d 1075 (D.C. Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976). In both cases, legislation passed after commencement of a civil action would have required adjudication of the dispute before an administrative panel. Each time, federal court jurisdiction over the pending case was sustained, since the length of time elapsed since the start of the case meant "it would constitute manifest injustice to impose retroactive road blocks in the form of new procedural impediments to a hearing on [plaintiff's] cause of action." *Lawrence v. Staats*, 665 F.2d at 1259. Litigating the PBGC claims in the Article III District Court rather than the Article I Bankruptcy Court would not fall within the narrow scope of these cases and does not rise to the level of "manifest injustice".

**C.**

PBGC's remaining arguments raise the thorniest questions in this case. It argues that § 157(d) is not limited to proceedings where non-bankruptcy law dominates the determination of the case, and contends that resolution of the Contribution Claims and Letter Claims proceedings requires consideration of ERISA and the IRC.

■ PBGC correctly states that § 157(d) is not simply a codification of § (c)(2) of the Emergency Rule that governed bankruptcy court proceedings between *Marathon* and July 10, 1984.[4] While the first sentence of

---

**2.** General Order No. 84 provides:

> The President has signed into law the Bankruptcy Amendments and Federal Judgeship Act of 1984. Section 157(a), Chapter 6 of Title 28, United States Code, provides that "any and all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11 shall be referred to the Bankruptcy Judges for the District".
>
> Accordingly, until further order of the Court, and notwithstanding questions of constitutionality of the appointment of Bankruptcy Judges and the payment of their salaries pursuant to the Act,
>
> IT IS ORDERED that all such cases and proceedings now pending in the Bankruptcy Court or hereinafter filed are so referred to the Bankruptcy Judges pursuant to Section 157(a) of the Act, *supra;* and that the Bankruptcy Judges for this District are directed to accept the jurisdiction conferred upon them

by the Bankruptcy Amendments and Federal Judgeship Act of 1984 and to function thereunder.

**3.** The second limiting condition is clearly not present here. To the contrary, § 122(a) of the Amendments provides:

> Except as otherwise provided in this section, this title and the amendments made by this title shall take effect on the date of the enactment of this Act.

Section 122(b), which sets forth exceptions to the general principle of § 122(a), makes no mention of § 157(d). Moreover, § 157(d) applies to "any case or proceeding referred under this section", and as PBGC points out, the proceedings concerning its claims were referred to the Bankruptcy Court pursuant to § 157(a) by General Order No. 84.

**4.** Section (c)(2) provided:

> The reference to a bankruptcy judge may be withdrawn by the district court at any time on

§ 157(d) parallels § (c)(2), the second sentence, relied upon by PBGC, is entirely new, and cases decided under § (c)(2) and cited by the Trustee are not relevant. PBGC is on less stable ground, however, when it suggests that § 157(d) strips district courts of all discretion once a party moves for withdrawal of reference. Indeed, in its reply brief PBGC simultaneously advocates such a position and recognizes its untenability:

> ... If Congress simply intended to endorse the case law developed under Section (c)(2) of the Emergency Rule, it could have done so simply by limiting Section 157(d) to the first sentence, or by attempting to codify the principles the [Trustee] claims can be distilled from the case law under Section (c)(2). Instead, Congress added a completely new provision which *mandates* withdrawal "if resolution of the proceeding requires *consideration* of both title 11 and other laws of the United States ...." (Emphasis added). Neither the plain language of the mandatory withdrawal provision nor the legislative history suggests that it applies only to non-core proceedings in which non-bankruptcy federal law "dominates" the decision. Congress certainly was capable of including such limitations if it had found them appropriate.[5]

> [5] Of course, Section 157(d) does not have to be read to require withdrawal when consideration of federal non-bankruptcy law would be *de minimus*. In the present case, however, consideration of ERISA is far from *de minimis*.

Reply Brief at 20.

As the footnote recognizes, mandatory withdrawal of all proceedings requiring consideration of non-Code federal law would force district courts to withdraw matters in which Code questions overwhelmingly predominate and consideration of non-Code statutes would be *de mini-* *mus.* Moreover, any reading of § 157(d) which limits bankruptcy court jurisdiction to questions arising solely under the Code would strip the court of much of its authority to resolve debtor-creditor disputes, since numerous Code provisions themselves require reference to other state and federal law. Both the Contribution Claims—a reclassification proceeding under § 507—and the Letter Claims—arising as a § 502 objection to claim—involve statutory provisions that explicitly refer to non-Code law. Under § 502, for example

> ... To the extent that applicable law, including state law, would afford the debtor a defense to a claim of a creditor, in whole or in part, absent bankruptcy, such defense is available to the trustee in objecting to the claim ....

3 J. Moore & L. King, *Collier on Bankruptcy* ¶ 502.02[1] at 502–24 (15th ed. 1982). Under § 507, the claims entitled to statutory priority derive their status from state law:

> Assets of a debtor in the trustee's hands are subject to all of the equities, liens and incumbrances in favor of third persons that exist at the date of the bankruptcy and are not invalidated by the law.

*Id.* ¶ 507.02[2] at 507–16. Similarly, § 507(a)(1) specifically requires consideration of matters arising under chapter 23 of Title 28 U.S.C. (28 U.S.C. §§ 1911–1930), § 507(a)(4) refers to pension law (a federal question under ERISA), and § 507(a)(6) requires consideration of myriad federal taxes and customs duties.

Section 157(d) must therefore be read to require withdrawal not simply whenever non-Code federal statutes will be *considered* but rather only when such consideration is necessary for the *resolution* of a case or proceeding. The preceding analy-

its own motion or on timely motion by a party. A motion for withdrawal of reference shall not stay any bankruptcy matter pending before a bankruptcy judge unless a specific stay is issued by the district court. If a reference is withdrawn, the district court may retain the entire matter, may refer part of the matter back to the bankruptcy judge, or may refer the entire matter back to the bankruptcy judge with instructions specifying the powers and functions that the bankruptcy judge may exercise. Any matter in which the reference is withdrawn shall be reassigned to a district judge in accordance with the court's usual system for assigning civil cases.

sis of legislative history and the Code's structure demonstrates the importance of the observations during the House debate that § 157(d) was not intended to become "an escape hatch through which most bankruptcy matters will be removed to the district court", *supra* at 13, and in the Senate debate that district courts "should not allow a party to use this provision to require withdrawal where such laws are not material to the resolution of the proceeding." *Id.* at 14. Consequently, in light of the congressional goal of having expert bankruptcy judges determine complex Code matters to the greatest extent possible, PBGC's motion to withdraw reference should be granted only if the current proceedings before the Bankruptcy Court cannot be resolved without substantial and material consideration of ERISA and IRC provisions.

**D.**

With this standard in mind, this Court examines PBGC's assertions concerning the ERISA and IRC questions allegedly involved in the Contributions Claims and the Letter Claims.

**1.**

PBGC asserts that "any determination regarding the priority to be afforded minimum funding contributions owed for the period of administration requires an analysis of the implications of permitting a debtor to continue a pension plan without facing up to the cost of maintaining the plan as imposed by ERISA and the IRC." PBGC Reply Brief at 8. It suggests that five ERISA questions are posed in the Contributions Claims proceeding.

The first two issues are merely unchallenged assertions of hornbook ERISA law: that compliance with minimum funding standards for the plans is a statutory requirement, and that White's minimum funding obligations accrued daily and would have ceased had the plans been terminated on or after the petition date. Third, PBGC contends that the Trustee's attempt to reclassify the claims "arbitrarily seeks to divide the unitary obligation im-

posed by ERISA (and the IRC) into one large piece (to be treated as a non-priority debt) and one small piece (to be treated as an administrative expense)" in a manner that "is not only utterly inconsistent with the funding requirements but would subvert the purposes those requirements are designed to serve—namely, sound funding of pension plans and protection of the plan termination insurance system." *Id.* at 4–5. Fourth, it argues that "the manner in which the [Trustee] has calculated the amounts it asserts are entitled to priority is fundamentally inconsistent with the minimum funding standards and with the calculations underlying the PBGC's claims." *Id.* at 5–6. Finally, it submits that "[a]cceptance of the [Trustee's] position would mean that after filing a bankruptcy petition, a debtor could choose to continue its pension plans without paying in full for the minimum funding contributions that arise as a result of the debtor's post-petition continuation of the plans." *Id.* at 7.

The Trustee responds by contending that the pertinent ERISA and IRC provisions merely determine the amount of the minimum funding contribution to a pension plan—an amount he does not dispute for purposes of the reclassification proceedings—and that no further ERISA or IRC issues are relevant to the current litigation:

> ... The issue before the Court in the Reclassification Proceeding is not a determination of the amount of the minimum funding contribution, but instead, it is a determination of that portion of the agreed amount which is non-priority and that portion which is priority. That question is determined exclusively by examination and application of Sections 503 and 507 of the Bankruptcy Code. ... The fact that PBGC, as trustee of the pension plans, may not receive 100% of its claims does not mean that ERISA must be considered or that a decision on priority represents a fundamental challenge to the minimum funding standards.

Trustee Reply Brief at 8–9.

**2.**

With respect to the Letter Claims, PBGC specifies three issues requiring considera-

tion of ERISA. First it recites the Sixth Circuit's holding that PBGC has a statutory as well as contractual claim against the estate. No disputed issue is specified. The second issue concerns an "escape clause" in the letters; PBGC speculates that if certain parole evidence proffered by the Trustee and the UAW is admitted, "the court will then have to reconsider whether ERISA is the type of legislation described in the escape clause, as well as the interrelation between the Guarantee Letters and ERISA." PBGC Reply Brief at 9. The third issue arises with respect to anticipated arguments by the UAW "that under Section 509(c) of the Code, the PBGC is not entitled to recover from White the amount of benefits of a participant under the Guarantee letters which are also guaranteed by the PBGC unless the PBGC has paid those benefits in full .... Resolution of this issue clearly requires consideration of ERISA, and resolution in the manner suggested by the UAW would create an unnecessary conflict between the Bankruptcy Code and ERISA." *Id.* at 9–10.

The Trustee contends that all standing issues have been resolved by the Sixth Circuit, that "[t]he amount of the PBGC's alleged claims will be determined solely by the contractual obligations of the pension plans and the Guarantee Letters", that "valuation of claims is determined under substantive contract law" unrelated to ERISA or other federal statutes, and that the Trustee and UAW intend to raise dispositive issues before the question of valuation is ever reached that will not involve other federal statutes. Trustee Brief at 19–20. Similarly, UAW argues that the issues concerning the Letter Claims relate to: (1) interpretation of the liability limitation provision of the letters; (2) the scope of the Sixth Circuit's remand; (3) limitations on the parole evidence rule under federal common law; (4) "whether the federal statute giving rise to PBGC's recovery, a question of ERISA"; and (5) whether § 509 of the Code requires subordination of a codebtor to the claims of a creditor. UAW Brief at 7. The Trustee, in his reply brief, adds that if UAW does indeed raise the argu-

ment that § 509 requires subordination of PBGC's claims, "its resolution will require only a consideration of the Bankruptcy Code and not of ERISA", since "the only issue left to decide is how delay affects subordination under Section 509 ..." Trustee Reply Brief at 10.

E.

■ This Court has considered all of the preceding arguments. It has also given close attention to those documents in the record which give the clearest picture of what will probably happen during the upcoming Bankruptcy Court hearings, in particular the trial briefs concerning the Contribution Claims and the Bankruptcy Court's interim order in the Letter Claims proceeding. PBGC has demonstrated that some ERISA and IRC questions will probably be raised during the next round of litigation, and that many ERISA and IRC questions may possibly be raised. But the Amendments as a whole and § 157(d) in particular must be read to require withdrawal of the proceedings from the Bankruptcy Court only if this Court can make an affirmative determination that resolution of the claims will require substantial and material consideration of those non-Code statutes. On the present record, no such determination is possible. For this Court to grant the motion to withdraw reference based on speculation about ERISA and IRC issues which may or may not arise and may or may not be germane to resolution of core Code proceedings would be inconsistent with the purposes underlying the very existence of the Bankruptcy Court and would encourage forum shopping in a manner Congress disdained when it sought to avoid "creating a multiplicity of forums for the adjudication of part of a bankruptcy case." 130 Cong.Rec. H7492 (daily ed. June 29, 1984) (remarks of Rep. Kastenmeier). With all due respect for PBGC's skillful arguments, permitting the Bankruptcy Court to conduct core proceedings under § 157(b)(2)(B) is a sensible course of action dictated by the language and history of the Amendments, principles

706

of sound judicial administration, and the facts of this case. Whatever its ruling, an appeal may then be taken to this Court under § 158(a).

### IV.

The questions posed by the passage of the Amendments as a whole and § 157(d) in particular are novel and difficult. An appeal of this Court's answers would certainly not be frivolous. PBGC has submitted a motion for certification of an interlocutory appeal to the Sixth Circuit. Within ten (10) days, the Trustee shall submit a response, and PBGC shall submit a supplemental memorandum setting forth whether denial of a motion to withdraw reference is a decision properly subject to interlocutory appeal. PBGC should also consider whether such an appeal would resolve its claims more expeditiously than would a trial in the Bankruptcy Court followed by an appeal to this Court. Proceedings in the Bankruptcy Court with respect to the PBGC claims are stayed pending this Court's ruling on the motion to certify.

IT IS SO ORDERED.