Alan D. SIBARIUM, Trustee for Debtor, R.F.D., Inc. and Collecting Bank, N.A. (successor in interest to First City Bank—Valley View) Plaintiffs,

v.

NCNB TEXAS NATIONAL BANK and FDIC as Receiver for First Republic Bank—Dallas, Defendants.

Civ. A. No. 3–89–0469–H.

United States District Court, N.D. Texas, Dallas Division.

Nov. 2, 1989.

Marvin R. Mohney and G. Michael Curran, Akin Gump Strauss Hauer & Feld, Dallas, Tex., for plaintiffs.

William Frank Carroll and Joseph W. Coleman, Dallas, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

SANDERS, District Judge.

Before the Court is Defendants' Motion to Withdraw the Reference, filed February 16, 1989; Plaintiffs' Brief in Opposition, filed May 30, 1989; Defendants' Reply, filed June 12, 1989; and a letter from Defendants containing supplemental authority, received by this Court July 27, 1989.

## I. BACKGROUND OF THE BANKRUPTCY

Designer Fragrances, Inc. ("Designer") was a wholesale distributor of perfumes and colognes. Designer formed R.F.D., Inc. ("RFD"), a separate and wholly-owned subsidiary, in order to retail its fragrances through the Ross Stores chain. Designer financed its operations, in part, through loans from First RepublicBank Dallas ("FRBD"), predecessor-in-interest to Defendant NCNB. RFD similarly financed its operations in part through a loan from First City Bank—Valley View ("FCB"), predecessor-in-interest to Plaintiff Collecting Bank. FCB claims to have secured its loan to RFD in part by executing an interest in the accounts and inventory of RFD.

On or about March 11, 1988, both Designer and RFD filed for bankruptcy under Chapter 11 of the Bankruptcy Code. In early April, 1988, FRBD agreed to provide Designer with additional post-petition financing pursuant to an order of the Bankruptcy Court entered on April 8, 1988. On April 26, 1988, the Bankruptcy Court, per Judge Felsenthal, granted RFD's motion to sell its assets free and clear of liens and interests, and the proceeds from this sale were placed in an escrow account.

The Bankruptcy Court administratively consolidated the Designer and RFD cases on May 20, 1988, and the consolidated action was transferred to Judge Abramson's Court. Judge Abramson converted the RFD case to a Chapter 7 proceeding on June 6, 1988, and the same was done for the Designer proceeding shortly thereafter. At this time, Plaintiff Sibarium was appointed as trustee of the proceeding.

On July 29, 1988, the Comptroller of the Currency declared FRBD insolvent and appointed the FDIC as its receiver. The FDIC entered into a "purchase and assumption" agreement[1] with a "bridge bank"[2] to continue the operation of FRBD's banking business while the FDIC attempted to find a buyer for FRBD. The FDIC also contracted with Defendant NCNB to provide management services to the bridge bank, and then brought in NCNB in a transaction whereby NCNB acquired at least some of FRBD's assets, including FRBD's claims against Designer. Pursuant to a collateral agreement, the FDIC became indemnified to NCNB for certain liabilities arising from claims that might be asserted against FRBD.

Plaintiffs commenced an adversary proceeding on December 15, 1988 against NCNB. February 2, 1989 brought a motion for intervention by the FDIC as Defendant based upon its potential liability to NCNB under the indemnity agreement. The Complaint in the adversary proceeding alleges that, subsequent to the bankruptcy filings of Designer and RFD, the FDIC, NCNB and FRBD at one time or another operated the businesses of the debtors for their own benefit by, *inter alia*, collecting and converting inventory belonging to RFD's estate (subject to the first priority security interest of Plaintiff Collecting Bank)—without authorization from the Bankruptcy Judge, without obtaining relief from the automatic stay, and without Plaintiffs' consent.[3] The Defendants answered the complaint, demanding a trial by jury, and contemporaneously filed the motion now under consideration. On February 14, 1989, Judge Abramson stayed the bankruptcy litigation pending resolution of this motion, and on April 5, 1989 granted the FDIC's motion to intervene. Obviously, the parties' essential dispute centers on their asserted interests in the debtors' remaining assets.

## II. WITHDRAWING THE REFERENCE

Defendants move for withdrawal of the reference to the Bankruptcy Court pursuant to 28 U.S.C. 157(d), which provides:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. 157(d). Under § 157(d) Congress provided for both permissive and mandatory withdrawal of the reference, and Defendants have moved for each. The Court

---

**1.** A purchase and assumption agreement arranges for a healthy bank to purchase some or all of the assets and liabilities of a failed bank and reopen the failed bank without interrupting banking operations and without loss to the customers. This arrangement usually involves three entities: the receiver of the failed bank (usually the FDIC), the purchasing bank, and the FDIC as insurer. *See Gunther v. Hutcheson,* 674 F.2d 862, 865 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

**2.** In facilitating the sale of a failed bank, the FDIC may create an intermediary or "bridge" bank to operate the failed bank's business for a short period of time while the final transaction is negotiated. A bridge bank is a national bank chartered under the laws of the United States in order to preserve the value of the failed bank until an interested purchaser can be found. *See* 12 U.S.C. § 1821(i).

**3.** The Complaint alleges the following causes of action:

Count 1: Suit for Accounting (11 U.S.C. §§ 542(a), (e) and 543(b));

Count 2: Turnover (11 U.S.C. §§ 542, 543 and 549);

Count 3: Breach of Fiduciary Duty (11 U.S.C. §§ 542, 543, 548, 549, 704 and Texas Common Law);

Count 4: Conversion of Collateral (11 U.S.C. §§ 548, 549 and Texas Common Law);

Count 5: Equitable Subordination (11 U.S.C. § 510 and Texas Common Law);

Count 6: Violation of Automatic Stay (11 U.S.C. § 362);

Count 7: Declaratory Judgment to Determine Priority of Liens (28 U.S.C. § 2201, Tex.Civ. Prac. & Rem.Code §§ 37.001 *et seq.* and Art. 9 of Tex.Bus. & Comm.Code);

Count 8: Attorneys' Fees.

first turns to the conditions warranting mandatory withdrawal.

A. *Mandatory Withdrawal of the Reference.*

   1. Circumstances Requiring Withdrawal.

■ A district court must withdraw the reference, upon its own motion or that of any party, where resolution of the proceeding before the bankruptcy court "requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." *Id.* Courts now generally agree that a party making a timely motion for mandatory withdrawal must establish that the proceeding involves a "substantial and material" question of both Title 11 and non-Bankruptcy Code federal law and that the non-Code federal law has more than a *de minimis* effect on interstate commerce. *Block v. Anthony Tammaro, Inc. (In re Anthony Tammarro)*, 56 B.R. 999, 1007 (D.N.J.1986); *see also In re Chateaugay Corp.*, 86 B.R. 33, 36–37 (S!D.N.Y.1987); *In re Asinelli, Inc.*, 93 B.R. 433, 434 (M.D.N.C.1988).

Before withdrawing the reference, the district court must make an "affirmative determination" that the relevant non-Code legal issues will require substantial and material consideration, and the Court must be satisfied that consideration of these federal laws requires "significant interpretation" on the part of the Court. *In re Johns–Manville Corp.*, 63 B.R. 600, 602 (S.D.N.Y.1986). Withdrawal should not be made based on "speculation about … issues which may or may not arise and may or may not be germane to resolution" of the proceedings." *In re White Motor Corp.*, 42 B.R. 693, 705 (N.D.Ohio 1984).

To allow withdrawal upon mere speculation would be to create "an escape hatch through which most bankruptcy matters will be removed to the district court," a

consequence that does not comport with congressional intent. *See In re Chateaugay Corp., supra,* 86 B.R. at 36 (*citing* remarks of Rep. Kramer, 130 Cong.Rec. H1849–50 (daily ed. March 21, 1984)); *White Motor, supra,* 42 B.R. at 700 (same). As articulated by the *White Motor* court, Congress intended that "expert bankruptcy judges [would] determine complex [Bankruptcy] Code matters to the greatest extent possible." *Id.* at 704; *see also In re Combustion Equip. Assocs.,* 67 B.R. 709, 711 (S.D.N.Y.1986), *aff'd,* 838 F.2d 35 (2d Cir. 1988) (Congress intended that the district courts would withdraw proceedings in only a limited class of cases).[4]

*In re Combustion Equipment Associates, Inc.,* 67 B.R. 709 (S.D.N.Y.1986), *aff'd,* 838 F.2d 35 (2d Cir.1988), provides a clear example of a case in which withdrawal of the reference was mandatory. In that case the district court found that substantial consideration of the Superfund statute[5] was necessary in order to determine whether a confirmed bankruptcy reorganization plan also discharged the debtor from liability under the Superfund law. The proceedings there squarely presented a conflict between competing policies of the Superfund law and the Bankruptcy Code. *See id.* at 713. Similarly, this Court withdrew a reference where the bankruptcy proceeding involved issues of law unequivocally necessitating significant interpretation of the Employee Retirement Security Act ("ERISA") and Internal Revenue Code. *Great Western Sugar Co. v. Interfirst Bank,* No. 3–85–1755–H, 1985 W.L. 17671 (N.D.Tex. Nov. 6, 1985).

   2. The Application of *D'Oench Duhme* Doctrine Here Is Merely Speculative.

Defendants assert that "the determination of FDIC's and NCNB's liability for the alleged misconduct of FRBD requires a thorough examination of recent judicial interpretations of *D'Oench Duhme* [doctrine]

---

**4.** Accordingly, the district court should also refrain from withdrawing the reference where a case necessitates only straightforward application of non-Code federal law. *Johns–Manville, supra,* 63 B.R. at 602; *In re Tammarro, supra,* 56 B.R. at 1007 n. 11.

**5.** Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*

and [12 U.S.C.] § 1823(e)." Defendants' Reply at 5. The *D'Oench Duhme* doctrine, a creature of federal common law, serves to estop a maker of a promissory note from asserting, as a claim or defense, that the FDIC in taking over a failed bank cannot collect upon the note because the maker and the failed bank secretly agreed to alter or vary the terms of note as written. *See D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In *D'Oench Duhme* the Supreme Court held that a maker who " 'lent himself to a scheme or arrangement' that was likely to mislead bank examiners may not assert against the FDIC any part of an agreement that might diminish the value of his written loan obligation." *Beighley v. FDIC*, 868 F.2d 776, 784 (5th Cir.1989). Central to this doctrine is a recognition that the FDIC must have some method of evaluating the potential liability it incurs in taking over and then reselling a failed bank, as in a purchase and assumption agreement, and that any such method primarily involves reliance on the books and records of the failed bank. *See Gunther v. Hutcheson*, 674 F.2d 862, 870 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

Congress recognized the importance of this policy in 1950 by enacting 12 U.S.C. § 1823(e), which provides:

> No agreement which tends to diminish or defeat the right, title or interest of the [FDIC] Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee,

and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

12 U.S.C. 1823(e). The plain words of this provision expand the *D'Oench Duhme* defense by eliminating the need for fault on the part of the obligor.[6]

The essential purpose, then, behind *D'Oench Duhme* and §ʹ1823(e) is to enable the FDIC to quickly but accurately value the assets of a failed bank on the basis of the books and records available. This prevents an obligor from asserting against the FDIC unwritten understandings that vary the terms of a failed bank's loan assets.

According to Defendants, "Plaintiffs are expressly seeking recovery largely for the actions and alleged *misconduct* on the part of FRBD." Defendants Reply at 5 (emphasis in original). Defendants assert that the policies of *D'Oench Duhme* have been extended to protect the FDIC from liability for all misconduct on the part of the failed banks it takes over. Defendants then argue that such protection should be extended to NCNB in its role as bridge bank and purchaser of certain FRBD assets and liabilities. The application of *D'Oench Duhme* and § 1823(e) to this case, Defendants claim, requires substantial and material consideration of federal statutory and common law regulating interstate banking so as to mandate withdrawal of the reference.

The authority upon which Defendants rely for this proposition, however, does not support their argument. On-point cases cited by Defendants centrally concern the avoidance of loan repayments by obligors through assertions of unrecorded side agreements between the obligors and the failed bank. Any misconduct found in these cases simply involves the failure by a failed bank to adhere to the promises made under the oral side agreement. *See, e.g., Matter of CTS Truss, Inc.*, 859 F.2d 357, 361 n. 7 (5th Cir.1988), *on reconsideration*, 868 F.2d 146 (5th Cir.1989) ("Here, CTS

---

**6.** By its language § 1823(e) only applies to the FDIC in its corporate capacity. *Beighley*, 868 F.2d at 783. However, the Fifth Circuit, following the Supreme Court's lead, has held that the

protections of *D'Oench Duhme* extend to the FDIC in its capacity as receiver. *Id.* 868 F.2d at 783–84.

alleges that it had an oral side agreement with the Bank to extend additional financing."); *Aero Support Sys., Inc. v. FDIC,* 726 F.Supp. 651, 654 (N.D.Tex.1989) ("The Court therefore finds that Plaintiff's claims based upon alleged oral side or secret agreements are barred as against the [FDIC] as Receiver for [Defendants]"); *RSR Properties, Inc. v. FDIC,* 706 F.Supp. 524, 531–32 (W.D.Tex.1989) (in an action for breach of contract against bank, court held that an alleged loan agreement supporting this cause did not constitute an agreement meeting the test of § 1823(e)); *FDIC v. MM & S Partners,* 626 F.Supp. 681, 687 (N.D.Ill.1985) (applying *D'Oench Duhme* to defeat defenses asserted by obligors on a promissory note where obligors claimed that bank's conduct excused them from meeting certain terms of written loan agreement).

■ As the Fifth Circuit has noted, "[t]he common thread running through these cases [applying the policies of *D'Oench Duhme* and § 1823] has been the assertion by the obligor that an oral side agreement with the bank controlled the rights of the parties." *FDIC v. Castle,* 781 F.2d 1101, 1106–07 (5th Cir.1986). The instant case involves no such agreement. Rather, Plaintiffs have alleged misconduct arising from unilateral behavior on the part of FRBD, FDIC, and NCNB.[7] *See* Plaintiffs' Complaint, *Sibarium v. NCNB Texas*

*Nat'l Bank,* Adversary No. 388–3833 (Bankr.N.D.Tex., filed Dec. 2, 1988).[8] The necessity of applying *D'Oench Duhme* or § 1823(e) in this proceeding, therefore, is at best speculative. The Court does not perceive the need for interpretation of non-Code issues of federal law that would mandate withdrawal of the reference from the Bankruptcy Court. *White Motor,* 42 B.R. at 693; *compare In re Chateaugay,* 86 B.R. at 38 (finding non-Code federal law issues to be concrete and presented in sharp conflict with competing provisions of Bankruptcy Code).[9]

This conclusion is consistent with discernible congressional intent directing courts to construe the mandatory withdrawal provision narrowly. *White Motor,* 42 B.R. at 699 (*citing* Senate Report). Further, although it is arguably sensible to insulate the FDIC from liability stemming from all types of undiscovered misconduct committed by the failed banks it rescues from collapse, Defendants' proposed expansion of *D'Oench Duhme* and its statutory counterpart is more an appropriate initiative for Congress and Federal administrators to consider as they grapple with our overstressed national banking system.

B. *Permissive Withdrawal.*

Section 157(d) also empowers a district court to grant withdrawal of the reference on permissive grounds: "The district court may withdraw, in whole or in part, any

---

7. Nowhere in their long but useful briefs do Defendants assert that *D'Oench Duhme* protects the FDIC or a bridge bank from the consequences of its *own* conduct. At least one court has concluded that the policies of this doctrine do not support such protection for the FDIC. *See FDIC v. Blue Rock Shopping Center,* 766 F.2d 744, 753 (3d Cir.1985) ("We have found nothing to demonstrate that [§ 1823(e)] was designed to protect the FDIC against the consequences of its own conduct with respect to the asset after acquiring it...."); *cf. FDIC v. Harrison,* 735 F.2d 408 (11th Cir.1984) (FDIC subject to defense of equitable estoppel arising from acts and representations of FDIC agents).

8. *See supra* n. 3.

9. Defendants argument that Plaintiffs' claim for attorneys fees mandates withdrawal must also fail. The Fifth Circuit's holding regarding the

assessment of attorneys fees against the FDIC in *Interfirst Bank Abilene v. FDIC,* 777 F.2d 1092 (5th Cir.1985), (cited by Defendants), seems to require only a straightforward application of the facts of this case, as ultimately found, to the stated law. *See supra* n. 4.

The Bankruptcy Court, upon further study of the legal issues, may recommend *sua sponte* the withdrawal of the reference should it determine that the proceeding requires substantial and material consideration of non-Code federal law. *See In re Moody,* 64 B.R. 594, 600 (Bankr.S.D. Tex.1986) (recommending withdrawal); *Hartley v. Derryberry,* 55 B.R. 781, 782 (Bankr.N.D.Ohio 1985) (ordering withdrawal). To the extent that the Bankruptcy Court errs in such a determination, Defendants may have a right to appeal under 28 U.S.C. § 158. *See International Ass'n of Machinists v. Eastern Air Lines, Inc.* (*In Re Ionosphere Clubs Inc. and Eastern Air Lines, Inc.*), 103 B.R. 416, 419 (S.D.N.Y.1989).

case or proceeding referred to under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. 157(d). While the legislative history of the 1984 Bankruptcy Amendments provides little guidance in the delineation of factors which support permissive withdrawal, the Fifth Circuit has offered some general guidelines for consideration:

> The district court's decision to hear a case like the present one, which will adjudicate the rights of the debtor and its creditor to insurance policy proceeds, *must be based on a sound, articulated foundation.... Marathon* [10] provides the outer boundary of original referred jurisdiction of the bankruptcy court, but *considerations of judicial economy also bear on the decision to withdraw the reference or refer to the bankruptcy court. The district court should consider the goals of promoting uniformity in bankruptcy administration, reducing forum-shopping and confusion, fostering the economical use of the debtor's and creditors' resources, and expediting the bankruptcy process.*

*Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 998–99 (5th Cir.1985) (emphasis added). Judge Buchmeyer has wisely interpreted this language as instruction from that court to avoid the "indiscriminate filing and granting of motions to withdraw the reference." *M & E Contractors, Inc. v. Kugler–Morris General Con-*

tractors, Inc., 67 B.R. 260, 268 (N.D.Tex. 1986).

In weighing the judicial economy to be served by withdrawal, a district court must consider whether the claims at issue involve "non-core" bankruptcy matters. "Non-core" matters are those matters that may be related to a bankruptcy proceeding but on which bankruptcy judges under the Bankruptcy Code do not have the authority to enter final orders or judgments. Conversely, "core" matters are those directly concerning the "restructuring of debtor-creditor relations" and which constitute the *"core* of federal bankruptcy power." *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (emphasis in original). With core matters, bankruptcy judges are empowered to enter final orders and judgments. 28 U.S.C. § 157(b).[11]

Congress devised the core and non-core distinction as part of the 1984 Amendments to help remedy constitutional infirmities in the 1978 Bankruptcy Act which the Supreme Court struck down in *Marathon, supra.*[12] To avoid the over-extension of Article III power perceived in *Marathon,* bankruptcy judges may only submit proposed findings of fact and conclusions of law to the district court on non-core legal issues. Thus, where non-core issues are present and where there is a jury demand and no consent for a binding trial by the

---

**10.** The quotation refers to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), in which the Supreme Court struck down the entire 1978 Bankruptcy Act as unconstitutional because the Act vested Article III judicial power in Article I judges. *See Matter of Wood,* 825 F.2d 90, 91 (5th Cir.1987). The *Marathon* decision prompted Congress to reenact the entire Bankruptcy Code through the Bankruptcy Amendments of 1984. *See* 11 U.S.C. §§ 1 *et seq.;* 28 U.S.C. §§ 151–158. Section 157(d) is a central jurisdictional provision in the Amendments.

**11.** Congress provided for a non-exclusive list of core proceedings in 28 U.S.C. 157(b)(2)(A–O). The uncertainty created by this listing has led more than one court to conclude that "there is significant room for difference in ascertaining whether any given matter ... is properly classi-

fied as core or non-core in nature." *In re Jackson,* 90 B.R. 126, 129 (Bankr.E.D.Pa.1988).

The Fifth Circuit has defined core proceedings as follows: "If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding.... If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding.... If the proceeding does not invoke a substantive right created by the federal bankruptcy law *and* is one that could exist outside of bankruptcy it is not a core proceeding...." *Matter of Wood, supra,* 825 F.2d at 97 (emphasis added). *See also Holland America, supra,* 777 F.2d at 998 (core matters are those that intimately involve the debtor-creditor relationship); *In re Paso Del Norte Oil Co.,* 755 F.2d 421, 425 (5th Cir.1985) (core matters are those that must be resolved in order to administer the estate).

**12.** *See supra* n. 10.

bankruptcy judge, considerations of judicial economy strongly suggest adequate cause for withdrawal. *See M & E Contractors, supra,* 67 B.R. at 268; *In re Blackman, supra,* 55 B.R. at 442 ("[F]or non-core proceedings [not involving federal law], considerations of judicial economy and efficiency would normally call for withdrawal of the reference so that a jury trial can be held in district court.").

▮ Section 157(b)(3) of 28 U.S.C. explicitly provides that "[t]he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." Therefore, the core/non-core distinction should be made in the first instance by the bankruptcy judge. To do otherwise would disregard the plain instruction of § 157(b)(3) and "would be inconsistent with the policy of having bankruptcy cases initially considered by a judge with expertise in bankruptcy law." *In re Pied Piper Casuals, Inc.,* 48 B.R. 294, 295 (S.D.N.Y.1985) (citation omitted); *In re Lion Capital Group,* 48 B.R. 329, 338 (S.D.N.Y.1985); *see also supra* p. 111. To this Court's knowledge, no such determination has been made by Judge Abramson, who is substantially more familiar with these proceedings. The Court therefore finds that permissive withdrawal at this stage of the proceedings would be premature and would not serve the interests of judicial economy so described in *Holland America, supra.*

It should be noted, however, that the facts of this case as well as persuasive authority from other cases inform the Court that the claims presented in the adversary complaint are indeed core matters. Practically all of the Plaintiffs' causes of action intimately involve a core proceeding under the Bankruptcy Code, including accounting, turnover, equitable subordination, and violation of the automatic stay. *See supra* n. 3. Plaintiffs correctly state that these causes are "provided for in the bankruptcy statutes and rules and are at the very heart of bankruptcy court administration." Plaintiffs' Brief at 12.

Moreover, it is undisputed that the misconduct complained of occurred after the filing of the bankruptcy petitions and after the bankruptcy court had assumed an active role in the proceedings. *See In re Mansker,* 60 B.R. 803, 806 (Bankr.D.Mass. 1986) ("The *operative events* in the present case likewise occurred post-petition and involved activities of the Debtor as Debtor-in-Possession, and for that reason the Court finds this to be a core proceeding."); *In re Jackson,* 90 B.R. 126, 130–31 (Bankr.E.D. Pa.1988) (holding a matter to be core where the "alleged wrongdoings and the relationship of same to the progress of the Chapter 7 cases, clearly appears to relate principally to actions taken by the Defendants after the filing of the initial bankruptcy case."); *Matter of Stockert Flying Svc., Inc.* 74 B.R. 704, 708 (N.D.Ind.1987) (holding a matter to be core where *"all of the allegations of the complaint attack the handling of the assets which make up the bankruptcy estate."*) (emphasis added). Furthermore, all of the alleged misconduct on the part of Defendants and the Plaintiffs' claims for recovery therefrom seem "inextricably linked" to the bankruptcy estate as a core matter. *Matter of Stockert, supra,* 74 B.R. at 707; *see also In re DeLorean Motor Co.,* 49 B.R. 900, 906 (E.D.Mich.1985).

Even if Plaintiffs' claims for attorneys fees or declaratory judgment are deemed pure non-core matters, it may be possible for the bankruptcy court to proceed anyway since "courts may determine that the entire proceeding is core if the core aspect heavily predominates and the non-core aspect is insignificant." *In re Blackman,* 55 B.R. at 443; *see also In re Lion Capital Group, supra,* 48 B.R. at 336–37 (fact that district court was required to review *de novo* bankruptcy judge's proposed findings and conclusions on two non-core claims of trustee was not sufficient reason to withdraw district court's reference where trustee also asserted seven core claims not subject to *de novo* review).[13] The plain words

---

**13.** The Court also notes that Bankruptcy Courts

in this Circuit routinely handle matters of attor-

of the Bankruptcy Code itself inform us that a court should not simply look to whether the source of the cause of action is in state law: "A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." 28 U.S.C. § 157(b)(3). The Court reemphasizes that this determination is properly made in the first instance by the bankruptcy court. *See supra* pp. 114–15.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for withdrawal of the reference to the bankruptcy court is DENIED.

SO ORDERED.

neys' fees and are granted broad discretion in so doing. *See Matter of Lawler,* 807 F.2d 1207 (5th Cir.1987).