In re OTTAWA CARTAGE, INC. and Nordic Transport, Inc., Debtors.

Maurice LEVINE, as Trustee of the Estate of Ottawa Cartage, Inc., Plaintiff,

v.

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al., Defendants.

Bankruptcy No. 82 B 08134–5.

No. 85 C 06885.

United States District Court, N.D. Illinois, E.D.

Nov. 8, 1985.

John H. Redfield, Chicago, Ill., for Maurice Levine.

Francis J. Carey, Chicago, Ill., for Central States.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This action originated as an adversary proceeding in the Bankruptcy Court for this District. Maurice Levine ("Levine"), the trustee in bankruptcy of Ottawa Cartage, Inc. ("Ottawa"), sued the Central States, Southeast and Southwest Areas Pension Fund ("Fund") and its trustees ("Trustees") to recover a $31,139.27 payment made by Ottawa to the Fund less than 90 days before the filing of the involuntary petition for (and Ottawa's immedi-

ate consent to) Chapter 7 bankruptcy proceedings.

After Levine moved under Fed.R.Civ.P. ("Rule") 56 [1] for summary judgment, Trustees both (1) contested the motion and (2) moved this Court under 28 U.S.C. § 157(d) ("Section 157(d)") for an order withdrawing the adversary proceeding from the bankruptcy court to this Court. For the reasons stated in this memorandum opinion and order:

1. Trustees' motion to withdraw is granted.
2. Ottawa's summary judgment motion is granted.

### Facts [2]

Long before encountering its difficulties that ultimately triggered bankruptcy, Ottawa had adopted Fund's pension plan (the "Plan") pursuant to a series of collective bargaining agreements with Teamsters Local 722. On October 19, 1981 Trustees sued Ottawa for unpaid contributions due Fund (Ex. B).[3] In March 1982 Ottawa and Trustees agreed (Ex. E) Ottawa would sell certain of its assets and turn over the proceeds of that sale to Fund. On April 2 this Court's colleague Judge James Moran (before whom Trustees' suit against Ottawa was pending) entered an order approving that stipulation (Nelson Aff. ¶ 12). Ottawa did sell the property, and on April 28 Ottawa paid Fund $31,139.27 (Ex. F).

Less than 90 days later (on June 22) an involuntary petition was filed against Ottawa under Chapter 7 of the Bankruptcy Code (the "Code"), Title 11 U.S.C.[4] On June 23 Ottawa consented to the entry of an order for relief. Levine then sued Fund

and Trustees to recover the April 28 payment as a voidable preference under Code § 547(b). Trustees counter with four arguments:

1. Rule 60 provides the sole avenue of relief from Judge Moran's order approving the March 1982 agreement between Ottawa and Trustees.
2. Once Judge Moran approved that agreement, it created a statutory lien, exempted by Code § 547(c)(6) from a bankruptcy trustee's avoidance powers.
3. Ottawa's $31,139.27 payment constituted a "contemporaneous exchange" under Code § 547(c)(1).
4. Employee Retirement Income Security Act of 1974 ("ERISA") § 403(c)(1), as amended by the Multi-employer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1103(c)(1),[5] prohibits Ottawa (or its trustee) from using Code § 547(b) to recover any contribution to Fund.

This opinion will treat briefly with the propriety of withdrawal of this dispute from the Bankruptcy Court, then turn to Trustees' arguments on the merits.

### Motion for Mandatory Withdrawal

■ Section 157(d) governs the withdrawal of proceedings from the Bankruptcy Court to this Court. Trustees' motion to withdraw focuses on the mandatory withdrawal provision contained in the second sentence of Section 157(d):

> The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United

---

1. Bankruptcy Rule 7056 renders Rule 56 applicable to adversary proceedings.

2. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose this Court must view the evidence in the light most favorable to the nonmovant. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984). Here there are no disputed facts at all, and thus no need for any inference-drawing.

3. Each citation to "Ex.—" refers to an exhibit attached to Trustees' brief in opposition to Ottawa's summary judgment motion.

4. All citations to the Code will take the form "Code § —" and will refer to Title 11's numbering.

5. All further citations to Title 29 will take the form "ERISA § —" and will refer to Title 29's numbering rather than to ERISA's internal numbering.

States regulating organizations or activities affecting interstate commerce.

*In re White Motor Corp.*, 42 B.R. 693, 703–04 (N.D.Ohio 1984) (emphasis in original) teaches persuasively:

Section 157(d) must therefore be read to require withdrawal not simply whenever non-Code federal statutes will be *considered* but rather only when such consideration is necessary for the *resolution* of a case or proceeding.... Consequently, in light of the congressional goal of having expert bankruptcy judges determine complex Code matters to the greatest extent possible, [Trustees'] motion to withdraw reference should be granted only if the current proceedings before the Bankruptcy Court cannot be resolved without substantial and material consideration of ERISA ... provisions.

Under that standard, this Court must grant withdrawal of this proceeding.[6] Trustees contend ERISA § 1103(c)(1) prohibits Ottawa's Code § 547(b) attempt to recover an otherwise voidable preference. Resolution of this adversary proceeding plainly necessitates "substantial and material consideration" of ERISA § 1103(c)(1). Section 157(d) mandates a withdrawal of reference.

### Motion for Summary Judgment

Code § 547(b) establishes five elements creating a preference:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Ottawa's April 28, 1982 payment of $31,139.27 to Fund unquestionably encompassed each of those elements:

1. It transferred Ottawa's property ($31,139.27) to a creditor (Fund).

2. It satisfied an antecedent debt (owed by Ottawa since 1981).

3. Code § 547(f) presumes Ottawa was insolvent during the 90 days immediately preceding the June 22, 1982 filing of the bankruptcy petition. No evidence has been offered to rebut that presumption.

4. Payment occurred 55 days before the June 22 filing of the bankruptcy petition.

5. Levine Aff. ¶¶ 4–7 shows unsecured creditors of Ottawa will at best receive a nominal dividend of 2% or less (and may receive nothing). Under the hypothetical calculation called for by Code § 547(b)(5), the $31,139.27 payment would represent about 25% of Fund's total unsecured claim against Ottawa, putting Trustees in a highly preferred position.

Trustees do not dispute that statutory fit between the payment it received and the standards of a voidable preference. Instead they advance the four contentions identified earlier in this opinion. Three of them merit short shrift, but the fourth requires serious consideration.

6. Ottawa does not contest Fund's motion for withdrawal of reference.

## 1. Rule 60(b)

Rule 60(b) authorizes limited relief from a final judgment. Trustees urge that Rule provides the only avenue of escape from Judge Moran's order approving Ottawa's agreement to pay Fund. From that premise, Trustees conclude a bankruptcy court lacks "power" to alter Judge Moran's order by ordering a return of the April 28, 1982 payment.[7]

■ Trustees wholly misperceive the thrust of Rule 60(b) and Code § 547(b). Rule 60(b) prescribes the bases for reopening final civil judgments. By contrast, Code § 547(b) operates not to "reopen" a judgment but rather to force the return of property collected under a concededly *valid* judgment. Trustees' reliance on Rule 60(b) simply misses the mark. Whether or not grounds exist to reopen a judgment under Rule 60(b) does not at all bear on Ottawa's ability to recover a preferential transfer under Code § 547(b).

## 2. Code § 547(c)(6)

Code § 547(c)(6) exempts certain statutory liens from the Code's preference provisions:

The trustee may not avoid under this section a transfer ... that is the fixing of a statutory lien that is not avoidable under section 545 of this title.

Trustees first point to 28 U.S.C. § 1331 ("Section 1331"), the grant of federal-question jurisdiction, as the statutory source of Judge Moran's power to enter the order approving Ottawa's stipulation to sell assets and to pay Fund the sale proceeds. That, say Trustees, renders the court order

a "statutory lien" on the proceeds. And because Ottawa paid Fund pursuant to that "statutory lien," it supposedly follows that Levine cannot now avoid the payment as a preferential transfer.

■ That claimed syllogism borders on the frivolous (or perhaps more accurately, actually crosses the border). All that is necessary is a quick look at the Code's definitions. Code § 101(45)(emphasis added) defines "statutory lien" as a:

lien arising *solely by force of a statute* on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, *but does not include* security interest or *judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute.*

If Judge Moran's order created a "lien" at all,[8] the lien did not arise "solely by force of" Section 1331. Because it arose only after and through judicial action, the lien (if any) constituted a "judicial lien" under Code § 101(30):

[a] lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding.

Trustees simply cannot use Code § 547(c)(6) to escape the Code's preferential transfer rules.

## 3. Code § 547(c)(1)

■ Trustees next assert they gave Ottawa "new value" in a "substantially contemporaneous exchange" within the scope of Code § 547(c)(1):

---

7. Trustees initially tendered that argument to the bankruptcy court in the brief they filed before they sought to withdraw the proceeding to this Court. Because after the withdrawal motion the parties elected to stand on their earlier-filed briefs, it is unclear whether Trustees rely only on the asserted inability of a bankruptcy court to alter the judgment of a district court or whether they claim no court—including this Court—can alter that judgment except through the Rule 60(b) mechanism. But because Trustees' position is flawed for the same reason in either event, this Court need not inquire further.

8. Code § 101(31) defines "lien" as:

charge against or interest in property to secure payment of a debt or performance of an obligation.

Because the stipulation did not specifically identify Ottawa's assets to be sold, and because nothing in the record indicates whether the proceeds of sale were commingled with Ottawa's other funds, and perhaps because of other factors further analysis might identify, it is unclear whether Judge Moran's order did create such a charge or interest.

(c) The trustee may not avoid under this section a transfer—

> (1) to the extent that such transfer was
>
> > (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> >
> > (B) in fact a substantially contemporaneous exchange.

They say their March 1982 stipulation to refrain temporarily from pursuing their lawsuit conferred "new value" on Ottawa in a "substantially contemporaneous exchange" for the April 28 payment. That position is itself bankrupt for two reasons.

At the outset, even taking Trustees' argument at face value, the "exchange" was not "substantially contemporaneous." Trustees' "forbearance" began at the latest in March 1982 when Ottawa and Trustees signed the Agreement (Ex. E). Ottawa made its promise of future payment then, and its payment was made nearly a month later. Trustees have presented no evidence the parties intended a contemporaneous exchange of new value for *money,* and the one-month hiatus between the forbearance and the payment indicates the transaction was not "in fact" substantially contemporaneous.

But Trustees' reliance on Code § 547(c)(1) is flawed for a more fundamental reason: Fund never conferred "new value" on Ottawa.[9] Code § 547(a)(2) (emphasis added) defines "new value":

> "new value" means *money* or *money's worth in goods, services, or new credit,* or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, *but does not include an obligation substituted for an existing obligation.*

*In re George Rodman, Inc.,* 39 B.R. 855, 858 (W.D.Okla.1984) (citations omitted) clarifies the purpose of Code § 547(c)(1):

> Finally, the theory behind the exception to the preference section is that there has been a fair exchange which caused no diminution to the estate.... When a creditor gives new value in exchange for a payment from the debtor there has occurred no depletion to the subsequent estate detrimental to other creditors.

*In re Lario,* 36 B.R. 582, 584 (S.D.Ohio 1983) rejected a like contention that mere forbearance created "new value":

> [Creditor] contends that its forbearance from exercising its rights under the lease constituted "new value" to the debtor, since such forbearance increased the value of [debtor's] restaurant and enabled the sale to be consummated. We do not agree.
>
> First, [creditor] gave nothing "new" to the debtor. [Creditor's] right to evict or not to evict upon default by [debtor] was a part of the bargain struck when the lease was executed. By forbearing from evicting [debtor], [creditor] was merely exercising a pre-existing right, not giving "new value." In exchange, the debtor's obligation to pay rent in a timely fashion was substituted with an obligation to pay an antecedent debt. This substitution of one obligation for another is specifically excluded from the definition of "new value" under § 547(a)(2).

Precisely the same is true here. Trustees' forbearance from obtaining an immediate judgment against Ottawa did not enhance Ottawa's estate. Any conversion of Ottawa's duty of payment to Fund from an immediate one to a deferred one (particularly where that conversion itself took place within the 90-day preference period) did not offset the diminution of Ottawa's estate when it paid the $31,139.27. See *In re Duffy,* 3 B.R. 263, 266 (S.D.N.Y.1980). In effect, the "forbearance" substituted

---

**9.** It is appropriate to address this fatal defect because Trustees might conceivably assert their forbearance was conceptually an ongoing one from moment to moment, so there was "new value" concurrent with the payment when made. That possible mental exercise need not be dealt with, in view of the text discussion that follows.

Trustees' right to pursue their lawsuit and receive payment immediately for their right to receive—and Ottawa's duty to pay—at a future date. Code § 547(a)(2) expressly excludes such substitutions of obligations from its definition of "new value." As *Duffy, id.* at 266 said:

> Such forebearance [sic] was of no economic solace to the creditors of this estate.

Trustees' forbearance argument must also fail.

### 4. *ERISA § 1103(c)(1)*

■ Trustees' final contention focuses on ERISA § 1103(c)(1):

> Except as provided in paragraph (2), (3), or (4) or subsection (d) of this section, or under sections 1342 and 1344 of this title (relating to termination of insured plans), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

Trustees urge that provision prohibits Levine, as Ottawa's trustee in bankruptcy, from recovering a preferential transfer under Code § 547(b) because:

> 1. Such recovery, coming from the assets of the Plan, would "inure to the benefit of" Ottawa.
>
> 2. ERISA's underlying public policy considerations call for its provisions to override any contrary Code provisions.

As to the first of those arguments, Trustees are not literally correct. Ottawa's is a Chapter 7 proceeding (not, for example, a Chapter 11 reorganization case). Ottawa is no longer in business, and its trustee Levine stands as surrogate for its creditors. Any recovery of the preferential transfer will simply enlarge the pool of assets available to satisfy administrative expenses and,

once they are fully paid, to provide a fractional dividend to Ottawa's creditors. Ottawa itself will never receive any of the recovered contributions. As *Deiches v. Carpenters' Health and Welfare Fund of Philadelphia*, 572 F.Supp. 766, 773 (D.N.J. 1983) (emphasis in original) put it:[10]

> A surrender of funds to the receiver does not "inure to the benefit" of the debtor-employer—it benefits the *creditors* of the employer. Neither does it represent, in any strict sense, a "return of funds" that must fit one of [ERISA § 1103's] narrow categories, for the funds go to the employer's creditors, not the employer-party in interest.

■ Relatedly, ERISA § 1103(c)(1) cannot be looked at in a vacuum. ERISA itself (in ERISA § 1144(d)) explicitly states the Act's provisions do not override other federal laws:

> Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law.

In accordance with that section, *Goff v. Taylor (In re Goff)*, 706 F.2d 574, 586–87 (5th Cir.1983) has specifically subordinated ERISA provisions to contrary provisions in the Code:

> It is well to make a final telling observation on the relationship between ERISA and the Bankruptcy Code. While ERISA preempts state law, 29 U.S.C. § 1144(a), it clearly was not intended to affect the operation of other federal law. . . . As we have already discussed, the Bankruptcy Code was, generally, intended to broaden the "property of the estate" available to creditors in bankruptcy and, specifically, intended to limit any exemption of pension funds. . . . Thus, ERI-

---

**10.** *Deiches* spoke in a different context—a state court receivership rather than a federal bankruptcy—so the case involved federal preemption or Supremacy Clause considerations, rather than the issues posed to this Court. But the *Deiches* line of analysis is persuasive, and if anything the present case (which at worst involves which of two federal statutes ought to prevail) would follow a fortiori from the upholding of a state insolvency provision over an ERISA-based argument (the *Deiches* situation).

378

SA's specific provision precluding interference with the operation of federal law renders the Bankruptcy Code effective over any ERISA provisions to the contrary.

Similarly, the only case either litigant or this Court has found directly in point (*In re Pulaski Highway Express, Inc.*, 41 B.R. 305, 309 (M.D.Tenn.1984)) (emphasis in original) [11] concluded Code § 547 must prevail over ERISA § 1103(c)(even assuming the latter were to forestall a trustee's recovery of a preference):

> The language of § 1144(d) could be no clearer: *nothing* in ERISA should be interpreted to impact other federal law. There is nothing in the legislative history to § 1103 or to § 1144(d) to suggest that the bankruptcy laws were not protected by § 1144(d) or were to be limited by § 1103(c). If § 1103 is interpreted to supercede [sic], modify or otherwise limit § 547 of the Bankruptcy Code, such a result would violate the proscription of § 1144(d). ERISA is internally consistent only if § 1103 is given a less pervasive interpretation than that argued by Central States. This court, therefore, will not interpret § 1103 in a manner that is inconsistent with the unambiguous language of § 1144(d).

Thus Trustees' effort to override Code § 547 with ERISA § 1103(c)(1) founders on the explicit proscription of ERISA § 1144(d).

As a last line of defense, Trustees would have it that—despite ERISA § 1144(d)—ERISA's reflection of public policy compels subordination of Code § 547 to ERISA § 1103(c)(1). ERISA § 1001(a) details the Act's underlying policy considerations and provides in part:

> The Congress finds ... that the continued well-being and security of millions of employees and their dependents are directly affected by these plans....

But it would be an odd kind of statutory construction that would allow such a general policy statement to nullify the explicit language of ERISA § 1144(d) and the even more explicit language of Code § 547. Indeed it must never be forgotten just how strong a public policy the latter statute manifests: the policy of "equality of distribution among creditors of the debtor." See *In re Davis*, 22 B.R. 644, 646 (M.D.Ga. 1982), quoting H.R.Rep. No. 595, 95th Cong., 2d Sess. 178, reprinted in 1978 U.S. Code Cong. & Ad.News 5787, 5963, 6138.

In short, the all-embracing language of ERISA § 1144(d) reflects Congress has already chosen to subordinate ERISA's policies to those of conflicting federal statutes. This Court will not second-guess that choice.

### Conclusion

Trustees' multifaceted resistance to Levine's effort to recover Ottawa's preferential payment to Fund has failed. There is no genuine issue of material fact, and Levine is entitled to a judgment as a matter of law. Accordingly:

1. This proceeding is withdrawn from the Bankruptcy Court.

2. Trustees are ordered to pay the sum of $31,139.27 [12] to Levine on or before November 18, 1985.

---

**11.** *Pulaski Highway* is so much on all fours with the present case that it actually involved the same Trustees, the same Fund and the same Plan as this one.

**12.** If Levine believes prejudgment interest is called for (a question not addressed by the parties), he should come in on motion before the payment due date.