824 F.2d 197
 56 USLW 2062, 8 Employee Benefits Ca 2049
 In re JONES & LAUGHLIN HOURLY PENSION PLAN and Pension
Benefit Guaranty Corporation, Plaintiffs-Appellees,
v.
The LTV CORPORATION, as Administrator of the Jones &
Laughlin Hourly Pension Plan, Defendant-Appellee.
Appeal of UNITED STEELWORKERS OF AMERICA.
In re PENSION PLAN OF REPUBLIC STEEL CORPORATION Dated &
Effective as of 3- 1- 50, and Pension Benefit
Guaranty Corporation, Plaintiffs-Appellees,
v.
LTV STEEL COMPANY, INC., as Administrator of the Pension
Plan of Republic Steel Corp. Dated & Effective as of 3-1-50,
and The LTV Corp., as Delegate of the Administrator of the
Pension Plan of Republic Steel Corporation Dated & Effective
as of 3-1-50, Defendants-Appellees.
Appeal of UNITED STEELWORKERS OF AMERICA.
 Nos. 1253, 1255, Dockets 87-6100, 87-6102.
 United States Court of Appeals,
Second Circuit.
 Argued May 20, 1987.
Decided July 17, 1987.
 
 Frank Cummings, Washington, D.C. (LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., of counsel), for appellee LTV Corp.
 Richard M. Seltzer, New York City (Bruce H. Simon, Sophia E. Davis, Cohen, Weiss and Simon, New York City, of counsel), for appellant United Steelworkers.
 Frank H. McCulloch, Sp. Counsel, Pension Ben. Guar. Corp., Washington, D.C. (Gary M. Ford, Gen. Counsel, Lincoln Weed, Pension Ben. Guar. Corp., Washington, D.C., of counsel), for appellee Pension Ben. Guar. Corp.
 Before VAN GRAAFEILAND, MESKILL and CARDAMONE, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from a judgment following an order of the United States District Court for the Southern District of New York, Owen, J., which denied the motion of intervenor United Steelworkers of America (Union) to vacate and/or stay a Consent Order previously signed by Judge Owen that terminated various pension plans of which the Union's members are participants. The Consent Order was submitted to the district court by LTV Corporation and LTV Steel Company (collectively "LTV"), the administrators of the plans, and the Pension Benefit Guaranty Corporation (PBGC). The Order appointed PBGC as statutory trustee of the various plans and terminated them.
 
 
 2
 The Union complains that the Consent Order was obtained in a procedurally deficient manner. Specifically, the Union claims that, under Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. Secs. 1301-1461 (West 1985 & Supp.1987) (ERISA), as amended by the Single-Employer Pension Plan Amendments Act of 1986, Pub.L. No. 99-272, Title XI (1986), and the Due Process Clause of the Fifth Amendment, it and other interested parties were entitled to notice and an adjudication prior to the district court's approval of the termination. We affirm the judgment of the district court.
 
 BACKGROUND
 
 3
 The Consent Order terminated the Jones & Laughlin Hourly Pension Plan and the Pension Plan of Republic Steel. These plans governed the benefits of thousands of past and present employees of Jones & Laughlin Steel, Republic Steel and Youngstown Sheet & Tube. The termination marks the largest involuntary termination in ERISA's history.
 
 
 4
 PBGC is the national insurer of pension plans. A wholly owned United States Government corporation, it was created to administer the mandatory termination insurance program established under Title IV of ERISA, guaranteeing plan participants a minimum level of benefits if their employers are unable to fund their plans. See In re Pension Plan For Employees of Broadway Maintenance Corp., 707 F.2d 647, 648-49 (2d Cir.1983) (describing PBGC in detail); Pension Benefit Guaranty Corp. v. Heppenstall Co., 633 F.2d 293, 295-97 (3d Cir.1980) (same).
 
 
 5
 The Union has served as the collective bargaining representative of the employees of LTV and its predecessors for over forty years. The Union and LTV currently are parties to various collective bargaining agreements.
 
 
 6
 LTV filed a petition in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 on January 17, 1986. LTV thereafter notified PBGC that it could not and would not make the contributions to the plans that ERISA's minimum funding standards require.
 
 
 7
 On January 12, 1987, PBGC informed LTV of its intention to terminate the plans. On the same day LTV assented to the Consent Order and the district court signed it. The plans' participants, the Union and other interested parties did not receive prior notice or a hearing. The next day newspaper advertisements publicized the terminations.
 
 
 8
 As a result of the terminations, PBGC will guarantee some but not all of the plans' benefits. The PBGC estimates that fifteen percent of current retirees will have their benefits reduced. Further accrual of benefits ended as a consequence of the termination.
 
 DISCUSSION
 Statutory Claim
 
 9
 The first question presented is whether ERISA requires that plan members and other interested parties receive notice and an opportunity to be heard before PBGC and the plan administrator may terminate a plan in a summary termination proceeding under subsection 1342(c).[1]
 
 
 10
 Subsection 1342(a) provides that PBGC may initiate involuntary termination proceedings whenever a plan fails to meet specified funding requirements. 29 U.S.C.A. Sec. 1342(a) (West 1985 & Supp.1987); Broadway Maintenance, 707 F.2d at 648. Here, PBGC determined that the plans failed one of these criteria--the minimum funding requirements outlined in 26 U.S.C.A. Sec. 412 (West 1978 & Supp.1987) and 29 U.S.C. Sec. 1082 (1982). PBGC notified LTV, the plans' administrator, of PBGC's intention to terminate and obtained LTV's assent to the Consent Order that appointed PBGC as statutory trustee of the plans and terminated them. PBGC and LTV thereupon presented the Consent Order to the district court pursuant to the fourth sentence of subsection 1342(c), which provides:
 
 
 11
 If the corporation [i.e., PBGC] and the plan administrator agree that a plan should be terminated and agree to the appointment of a trustee without proceeding in accordance with the requirements of this subsection (other than this sentence) the trustee shall have the power described in subsection (d)(1) of this section and, in addition to any other duties imposed on the trustee under law or by agreement between the corporation and the plan administrator, the trustee is subject to the duties described in subsection (d)(3) of this section.
 
 
 12
 29 U.S.C.A. Sec. 1342(c) (West Supp.1987).
 
 
 13
 On its face this sentence permits PBGC and the administrator to proceed as they did here, i.e., to proceed in summary fashion without affording plan members pretermination notice and hearings to contest the propriety of the termination decision.
 
 
 14
 The Union, however, contends that the fourth sentence of subsection 1342(c) exempts only the appointment of PBGC as trustee from the requirement of court approval. It opines that once PBGC is appointed trustee by agreement, it must notify all interested parties of the contemplated termination and afford them a right to be heard in court. For this proposition the Union cites subsection 1342(d)(2), which provides in pertinent part:
 
 
 15
 (2) As soon as practicable after his appointment, the trustee shall give notice to interested parties of the institution of proceedings under this subchapter to determine whether the plan should be terminated or to terminate the plan, whichever is applicable. For purposes of this paragraph, the term "interested party" means--
 
 
 16
 ....
 
 
 17
 (B) each participant in the plan and each beneficiary of a deceased participant,
 
 
 18
 ... and
 
 
 19
 (F) each employee organization which, for purposes of collective bargaining, represents plan participants employed by an employer described in subparagraph (C), (D), or (E).
 
 
 20
 29 U.S.C.A. Sec. 1342(d)(2) (West 1985). The Union concludes that after such notice has been provided the district court may hold proceedings to terminate the plans, a procedure allegedly violated here because PBGC applied to the court for a decree of termination at the same time it applied for appointment as the statutory trustee.
 
 
 21
 Subsection 1342(d)(2)'s notice provisions come into play when the PBGC determines that termination is necessary in the absence of an agreement with the administrator. In that case PBGC applies to the district court for appointment of a statutory trustee under subsection 1342(b)(1), which trustee serves pending the outcome of the court adjudication regarding termination contemplated in the first sentence of subsection 1342(c).[2] As a result, the Union's invocation of the notice requirements of subsection 1342(d)(2) depends by its terms on the premise that PBGC must obtain a court adjudication of the need for termination. If no adjudication was required, the summary proceedings employed here were appropriate and pre-termination notice would have served no purpose.
 
 
 22
 The fourth sentence of subsection 1342(c) provides that where, as here, PBGC and the plan administrator agree to terminate a plan, PBGC need not comply with the other requirements of "this subsection." These requirements include a court adjudication. See 29 U.S.C.A. Sec. 1342(c) (first sentence). Congress, therefore, expressly dispensed with the necessity of a court adjudication in these cases.
 
 
 23
 The remainder of the fourth sentence of subsection 1342(c) supports this interpretation. It grants to the trustee (PBGC) "without proceeding in accordance with the requirements of this subsection ... the power described in subsection (d)(1) of this section and [subjects the trustee] ... to the duties described in subsection (d)(3)." Id. (fourth sentence). These include post-termination powers and duties. See 29 U.S.C.A. Sec. 1342(d)(1), (d)(3) (West 1985 & Supp.1987). This grant of immediate post-termination authority confirms that Congress contemplated that termination could occur without a court adjudication.
 
 
 24
 Finally, the only mention of notice provided in subsection 1342(c) speaks to notice to the plan administrator. We cannot ignore Congress' obvious omission; there simply is no provision for notice to plan participants. In the context of requiring pre-termination notice to the administrator, that omission is telling.
 
 
 25
 Having concluded that no pre-termination court adjudication is required when PBGC and the plan administrator agree to terminate, we reject the Union's claimed statutory right to pre-termination notice.[3] In so holding, we note our deference to the interpretation proffered by PBGC, the federal agency responsible for administering the statutory regime at issue here. See Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 381, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969) (agency interpretation should be upheld unless demonstrably incorrect). Congress did not by its silence give the Union a pre-termination role in these matters. See Heppenstall, 633 F.2d at 301 (reaching same conclusion) (dictum).
 
 Due Process Claim
 
 26
 The second question presented is whether the termination of the plans without prior notice and hearings deprived participants of a property interest in violation of due process under the Fifth Amendment.
 
 
 27
 A claim of violation of due process requires (1) a cognizable property interest (2) deprived without adequate procedural safeguards. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542-43, 105 S.Ct. 1487, 1493-94, 84 L.Ed.2d 494 (1985). The Union grounds its claimed property right in the "legitimate expectation that [participants] will receive benefits pursuant to the terms of their pension plans." Br. of Appellant at 18.
 
 
 28
 We and other courts have suggested that pension plan members have a cognizable interest in receiving their contractually defined benefits. Cf. Textile Workers Pension Fund v. Standard Dye & Finishing, 725 F.2d 843, 850-51 (2d Cir.), cert. denied sub nom. Sibley, Lindsay & Curr Co. v. Bakery Workers International Union of America, AFL-CIO, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984); International Union, UAW v. Keystone Consolidated Industries, Inc., 793 F.2d 810, 815-17 (7th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 403, 93 L.Ed.2d 356 (1986). However, we need not address this question because, as we will explain, any claimed right to continuing contractual benefits was not taken away without due process.
 
 
 29
 The nature of the process due is defined by a balancing of three factors: (1) the private interest affected, (2) the risk of an erroneous deprivation under existing procedures and the value of more elaborate procedures, and (3) the governmental interest, including fiscal and administrative burdens, affected. Loudermill, 470 U.S. at 542-43, 105 S.Ct. at 1494 (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)).
 
 
 30
 The private interest affected may be viewed from two perspectives, one enhancing the Union's interest and the other undercutting it. The Union correctly perceives that, while PBGC acts on behalf of all pension plan beneficiaries including the members of the plans at issue here, PBGC's interest in terminating financially unsound plans as quickly as possible to minimize its losses conflicts with the participants' interest in continuing their particular plan. See Heppenstall, 633 F.2d at 296 (describing PBGC's interest in expeditious termination). As a result, the Union's complaint that PBGC does not fully represent the participants' interests substantially improves the Union's position.
 
 
 31
 The nature of the deprivation and of the participants' related expectancy, however, undercut the strength of the private interest here. The deprivation is not absolute; the retirees' benefits will be reduced, where necessary, only to federally insured levels provided in ERISA. See 29 U.S.C.A. Sec. 1322 (West 1985 & Supp.1987). PBGC estimates without contradiction that fifteen percent of current retirees will have their benefits reduced as a result of the termination. Br. of Appellant at 6.
 
 
 32
 The participants' reasonable expectancy affected by the termination, moreover, must to some extent reflect the possibility of termination. See 29 U.S.C. Secs. 1021, 1022 (1982) (requiring plan administrator to provide each participant with "summary plan description" containing information on possible plan termination and loss of benefits). This possibility is expressly contemplated by ERISA, the statutory regime enacted to redress the "great personal tragedy" of the outright loss of pension benefits by ensuring all benefits up to pre-set limits. Textile Workers Pension, 725 F.2d at 847-48. Finally, participants are free to file, in the bankruptcy court, claims against LTV for its failure to maintain the pension plans beyond January 13, 1987. In light of the foregoing paragraphs, we conclude that the nature of the private interest affected is substantial but not compelling. Cf. Goldberg v. Kelly, 397 U.S. 254, 270-71, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970) (complete deprivation of welfare benefits warrants pre-deprivation hearing, including cross-examination of adverse witnesses).
 
 
 33
 The second factor--the risk of error associated with existing procedures and the incremental value of additional procedures--strongly militates against pre-termination notice and hearings. The Union wholly fails to explain what, if any, increased accuracy would be realized by affording it a pre-termination hearing. The Union does not dispute that LTV is in bankruptcy and has announced that it will no longer contribute to the plans, or that PBGC faced ever-increasing liability each day the plans continued.
 
 
 34
 The existing regime, moreover, already includes ample post-deprivation remedies. Any party aggrieved by an act of PBGC may bring suit against it. 29 U.S.C.A. Sec. 1303(f) (West Supp.1987). PBGC also is liable as a fiduciary to participants in plans to which it is a trustee. Finally, in the event that the Union negotiates changes in the plans obviating the need for termination, PBGC can restore the plans to their pre-termination status. 29 U.S.C.A. Sec. 1347 (West Supp.1987).
 
 
 35
 The third factor--the government's countervailing interest--sharply tips the balance against the Union's position. Massive delays would result from affording court hearings to thousands of retirees. The Union does not persuasively contend otherwise. The effect of the delays, moreover, would be exacerbated by the concomitant accrual of greater benefits and service as the plans continued.[4] See Mathews, 424 U.S. at 348, 96 S.Ct. at 909 ("[a]t some point the benefit of an additional safeguard to the individual affected by the administrative action ... in terms of increased ... [accuracy], may be outweighed by the cost;" cost of protecting complainant "may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited") (citing Friendly, Some Kind of Hearing, 123 U.Pa.L.Rev. 1267, 1276, 1303 (1975)).
 
 
 36
 We conclude that notice and a court adjudication prior to the termination of the plans are not required and that the present administrative procedures comport with due process.
 
 
 37
 The judgment of the district court is affirmed.
 
 
 
 [1]
 The PBGC also issued a notice of its intention to terminate the Jones & Laughlin Retirement Plan for salaried retirees. The district court's order approving that termination is the subject of a companion appeal. See In re Jones & Laughlin Retirement Plan, 824 F.2d 202 (2d Cir.1987) (per curiam)
 
 
 [2]
 Subsection 1342(c) provides as follows:
 (c) Adjudication that plan must be terminated
 If the corporation is required under subsection (a) of this section to commence proceedings under this section with respect to a plan or, after issuing a notice under this section to a plan administrator, has determined that the plan should be terminated, it may, upon notice to the plan administrator, apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund. If the trustee appointed under subsection (b) of this section disagrees with the determination of the corporation under the preceding sentence he may intervene in the proceeding relating to the application for the decree, or make application for such decree himself. Upon granting a decree for which the corporation or trustee has applied under this subsection the court shall authorize the trustee appointed under subsection (b) of this section (or appoint a trustee if one has not been appointed under such subsection and authorize him) to terminate the plan in accordance with the provisions of this subtitle. If the corporation and the plan administrator agree that a plan should be terminated and agree to the appointment of a trustee without proceeding in accordance with the requirements of this subsection (other than this sentence) the trustee shall have the power described in subsection (d)(1) of this section and, in addition to any other duties imposed on the trustee under law or by agreement between the corporation and the plan administrator, the trustee is subject to the duties described in subsection (d)(3) of this section. Whenever a trustee appointed under this subchapter is operating a plan with discretion as to the date upon which final distribution of the assets is to be commenced, the trustee shall notify the corporation at least 10 days before the date on which he proposes to commence such distribution.
 29 U.S.C.A. Sec. 1342(c) (West Supp.1987).
 
 
 [3]
 The relevant legislative history does not support either the Union's or the PBGC's position. See generally H.R.Conf.Rep. No. 298, 93rd Cong., 1st Sess. (Aug. 12, 1974). As a result, we rely on our interpretation of the statute's language and the deference owed to the PBGC as the federal agency charged with implementing the statutory scheme at issue
 
 
 [4]
 As statutory trustee, PBGC was authorized to reduce benefits from the plans' assets to levels guaranteed by PBGC during the pendency of termination proceedings. 29 U.S.C. Sec. 1342(d)(1)(A)(iv). The Union contends that this authority sufficiently ameliorates the fiscal burden of delay to tip the balance in its favor. We disagree. The authority to reduce benefits does not terminate the ongoing accrual of benefits or reduce the unrelated administrative burdens incident to the massive delays engendered by pre-termination notice and hearings