**In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtors.**

**PENSION BENEFIT GUARANTY CORPORATION, Petitioner,**

v.

**The LTV CORPORATION, et al., Respondents.**

**No. 87 Civ. 6863 (RWS).**

United States District Court, S.D. New York.

Nov. 24, 1987.

As Amended April 28, 1988.

Davis Polk & Wardwell (Lewis B. Kaden, Karen E. Wagner, Sharon Katz, Richard Goldstein, of counsel), Levin & Weintraub & Crames (Michael J. Crames, of counsel), New York City, for LTV Corp.

Cleary Gottlieb Steen & Hamilton, New York City, for Pension Benefit Guaranty Corporation, George Weisz, of counsel.

Gary Ford, Gen. Counsel, Carol Connor Flowe, Deputy Gen. Counsel, Washington, D.C., for Pension Benefit Guar. Corp.

## OPINION

SWEET, District Judge.

Petitioner Pension Benefit Guaranty Corporation ("PBGC") has moved for an order pursuant to 28 U.S.C. § 157(d) (Supp. III 1985) withdrawing from the bankruptcy court the application of respondent LTV Corporation ("LTV") and its affiliated debtors, including LTV Steel Company, Inc. ("LTV Steel") for Orders for Enforcement of Automatic Stay and Prior Order and for Contempt ("Application"). For the reasons set forth below, the motion for withdrawal is granted.

*Background and Prior Proceedings*

PBGC is a wholly-owned United States government corporation established under § 4002 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1302, to administer the pension plan termination insurance program created under Title IV of ERISA, 29 U.S.C. §§ 1301–1461. *See generally In re Pension Plan For Employees of Broadway Maintenance Corp.*, 707 F.2d 647, 648–49 (2d Cir.1983) (describing PBGC in detail); *Pension Benefit Guaranty Corp. v. Heppenstall Co.*, 633 F.2d 293, 295–97 (3d Cir.1980) (same). When a pension plan covered by Title IV of ERISA terminates without sufficient funds to pay benefits guaranteed under Title IV, PBGC takes over the assets and liabilities of the plan and makes up any deficiency in plan assets from its own funds. The plan termination insurance program is funded by premiums PBGC collects from companies that maintain defined benefit pension plans, 29 U.S. C. §§ 1306, 1307, and liability amounts PBGC collects from employers that terminate underfunded pension plans. 29 U.S.C. § 1362. This program protects approximately 40 million American workers from the complete loss of their promised benefits in terminated, underfunded pension plans.

On July 17, 1986, LTV and associated debtors filed petitions for reorganization under Chapter 11 of the Bankruptcy Code ("Code"). One of the primary reasons for the filing of the bankruptcy petitions was LTV's inability to meet pension funding requirements. LTV, directly and through various subsidiaries, was the administrator of approximately thirty defined benefit pension plans. By the middle of November 1986, LTV owed $390 million in unpaid contributions from 1984 and 1985. Most of these contributions were due to three of LTV Steel's pension plans (the "Plans").

As a result of LTV Steel's failure to meet its funding obligations to the Plans, PBGC initiated proceedings under § 4042(a)(1) of ERISA to terminate the plans and to be appointed statutory trustee. LTV, as plan administrator, consented to the relief requested by PBGC. On January 12, 1987, the district court issued consent orders terminating the plans effective January 13, 1987, and appointing PBGC statutory trustee. As a result of the terminations, later affirmed by the Court of Appeals over the objections of the United Steelworkers of America ("USWA"), *see In re Jones & Laughlin Pension Plan*, 824 F.2d 197 (2d Cir.1987), PBGC assumed control of over one billion dollars in Plan assets, and commenced making statutorily guaranteed payments to retirees as mandated by ERISA. The present value of LTV's unfunded termination liability with respect to the Plans has been estimated to be in excess of $2 billion.

After termination of the Plans, payment of certain supplemental pension benefits which are not guaranteed by PBGC ceased,

causing reduced payments to approximately fifteen percent of LTV Steel's retirees, or about 8,000 people. In response, in April 1987, LTV Steel obtained bankruptcy court authorization to make a one-time hardship payment to the affected retirees, at a cost of $6 million.

During the spring and summer of 1987, LTV Steel and USWA, LTV Steel's principal union, negotiated a new collective bargaining agreement ("CBA") pursuant to which provision was made for payment of between 90% and 100% of the supplemental pension benefits that had been lost as a result of the termination. PBGC opposed LTV Steel's application to the bankruptcy court for authorization to enter into the CBA and sought to withdraw that reference to the district court. On July 17, 1987, the district court (the Honorable John F. Keenan) denied PBGC's motion to withdraw on the grounds that it was untimely.

On July 16, the bankruptcy court approved the CBA. PBGC sought a stay in the bankruptcy court pending an appeal to the district court. The stay was denied. PBGC then moved for a stay from the Court of Appeals, which was denied by Judge Pierce with leave to renew upon entry of the bankruptcy court's order. The bankruptcy court's order was entered on July 30 ("CBA Order"). PBGC appealed the CBA Order to this Court (the Honorable Leonard B. Sand). After LTV had moved to dismiss that appeal as interlocutory, PBGC moved on September 29 to withdraw its appeal without prejudice. Judge Sand granted PBGC's motion but retained jurisdiction in the event that PBGC should decide to renew the appeal.

In the meantime, on September 22, 1987, PBGC sent LTV a "Notice of Restoration" in order to reinstate the Plans, with their attendant liabilities, upon LTV Steel. PBGC's action marked the first time it had exercised ·its statutory authority under § 4047 of ERISA, 29 U.S.C. § 1347, to restore a pension plan that had been terminated under § 4042. On September 23, LTV filed its Application in the bankruptcy court for an order enforcing the automatic stay against PBGC, and declaring that

PBGC's attempt to restore the Plans to their pretermination status was a violation of the stay which was void and of no legal effect. On September 24, 1987, PBGC responded by commencing the instant proceeding with the filing of a petition for an order to show cause and for withdrawal of the LTV Application. Oral argument was heard on the petition for withdrawal on September 14.

*Mandatory Withdrawal Under Section 157(d)*

■ The provision for mandatory withdrawal of a proceeding from the bankruptcy court is set forth in 28 U.S.C. § 157(d), which provides, in pertinent part:

> The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

This section was part of the congressional response to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which held unconstitutional the broad grant of jurisdiction given to bankruptcy judges under the Code to hear and determine all matters arising under or related to Title 11.

The test for mandatory withdrawal under § 157(d) has been narrowly defined. Recognizing that a literal application of Section 157(d) could open a broad "escape hatch through which most bankruptcy matters [could] be removed to a district court," 130 Cong.Rec. H1850 (daily ed. Mar. 21, 1984) (Statement of Rep. Kramer), the district courts of this Circuit have followed the test announced by the District Court for the Northern District of Ohio in *In re White Motor Corp.*, 42 B.R. 693, 703, 705 (N.D.Ohio 1984): withdrawal is mandatory only when "substantial and material consideration" of non-Code federal statutes "is necessary for the *resolution* of a case or proceeding." *See In re Johns–Manville Corp.*, 63 B.R. 600 (S.D.N.Y.1986); *In re Combustion Equipment Assoc., Inc.*, 67 B.R. 709 (S.D.N.Y.1986); *cf. In re Anthony*

*Tammaro, Inc.,* 56 B.R. 999, 1006 (D.N.J. 1986) (withdrawal mandatory only if resolution of proceeding requires consideration of *both* Title 11 and non-Code federal law). Withdrawal is not mandatory in cases that require only the "straightforward application of a federal statute to a particular set of facts;" rather, mandatory withdrawal should be exercised only for "issues requiring significant *interpretation* of federal laws that Congress would have intended to have decided by a district judge rather that a bankruptcy judge." *In re Johns-Manville Corp.,* 63 B.R. at 602. In such cases, a district court does not have discretion to deny a petition for withdrawal. *See In re Combustion Equipment Assoc., Inc.,* 67 B.R. at 711.

*ERISA Issues in this Proceeding Mandate Withdrawal*

1. *The District Court Must Determine Whether a § 4047 Restoration is a Police or Regulatory Action*

Section 4047 of ERISA, 29 U.S.C. § 1347, provides in pertinent part:

In the case of a plan which has been terminated under section 4041 or 4042, [PBGC] is authorized in any such case in which [PBGC] determines such action to be appropriate and consistent with its duties under this title, to take such action as may be necessary to restore the plan to its pretermination status, including, but not limited to, the transfer to the employer or a plan administrator of control of part or all of the remaining assets and liabilities of the plan.

Although PBGC has terminated pension plans many times, it had never restored a plan to its pretermination status prior to sending the September 22 Notice of Restoration to LTV. PBGC's previously untested use of its statutory authority to restore terminated plans has, understandably, provoked vigorous opposition on the part of LTV.

As a company in reorganization under Title 11, LTV views the attempted restoration as an "act" to obtain or exercise control over its property in violation of 11 U.S.C. § 362, the Code's automatic stay provision. Although LTV contends that its Application can be resolved with reference only to § 362 of the Code, it nonetheless relies on an analysis of substantive ERISA provisions to support its position. Thus, in its Application, LTV has argued that since § 4042 of ERISA expressly exempts termination proceedings from the operation of the automatic stay, it is reasonable to infer that § 4047, which contains no express exemption, does not exempt restoration proceedings. PBGC, of course, disputes this inference and contends that a restoration proceeding under § 4047 is precisely the kind of "action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power" that the Code's Section 362(b)(4) itself exempts from the automatic stay.

A determination as to whether restoration under § 4047 of ERISA constitutes an exercise of regulatory power within the scope of the Code's exception under § 362(b)(4) will require substantial and material consideration of ERISA provisions. For example, LTV's Application raises the question of whether ERISA was enacted "primarily for financial reasons" or whether the interests ERISA seeks to protect are "primarily those of public health and welfare." *In re Lawson Burich Associates, Inc.,* 31 B.R. 604, 611 (S.D.N.Y.1983). Resolution of that issue will require substantial inquiry into the purposes and policies underlying ERISA and the pension plan termination insurance program in Title IV of the statute, the role of § 4047 in the statutory scheme, and the nature and extent of the PBGC's regulatory enforcement authority under Title IV generally and § 4047 in particular. Under the test applied in *In re White Motor Corp.,* a district court must decide this conflict of first impression between ERISA and the Code.

2. *The District Court Must Determine When PBGC's Claims Arose*

In its Application, LTV contends that the automatic stay applied to PBGC's restoration of the Plans because restoration was an attempt to "recover a claim" within the meaning of § 362(a). The automatic stay, however, does not apply to

claims that arise post-petition. Thus, LTV's characterization of PBGC's restoration raises precisely the issue that was before the court in *In Re Combustion Equipment Associates, Inc.* and *In re Johns–Manville Corp.*: namely, at what point in time, pre- or post-petition, did PBGC's claim against LTV arise.

In *In re Johns–Manville Corp.*, the Environmental Protection Agency moved to withdraw from the bankruptcy court two related adversary proceedings involving the question whether § 362 stayed the agency's claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") for costs incurred in a clean-up of hazardous waste landfills used by the debtor. Application of the stay depended on whether the claims arose before or after the bankruptcy was filed. District Judge Leval held that resolution of that question necessarily involved substantial and material consideration of CERCLA, and that therefore withdrawal of the reference was mandatory. *In re Johns–Manville Corp.*, 63 B.R. at 602–03. District Judge Sand followed this holding in *In re Combustion Equipment Associates*, 67 B.R. at 713.

■ PBGC asserts two claims against LTV, the first, as the government agency responsible for administering and enforcing Title IV, for termination liability under § 4062 of ERISA, and the second, in its capacity as statutory trustee of the Plans for due and unpaid contributions to the Plans.[1] A decision as to when the termination liability claim arose will turn, in part, on an examination of §§ 4042, 4048, 4062 and 4068 of ERISA. Similarly, a decision as to whether PBGC's claim for due and unpaid contributions arose pre- or post-petition will turn on an examination of the statutory provisions under Titles I, II and IV of ERISA that make PBGC responsible for collecting such contributions.

This brief recital of only some of the issues that the bankruptcy court would have to decide on LTV's Application is sufficient to indicate that its resolution will require "substantial and material" consideration of both bankruptcy and non-bankruptcy laws. Because the issues are ones of first impression in this or any other federal court, their resolution will involve "significant interpretation" of non-Code federal laws, which, as Judge Leval observed in *In re Johns–Manville Corp.*, is a task Congress intended to assign to district rather than bankruptcy courts.

For the foregoing reasons as well, this case is unlike *In re White Motor Corp.*, in which the District Court for the Northern District of Ohio declined to withdraw a proceeding that involved ERISA. In that case, the Court found that some of the ERISA issues involved were "merely unchallenged assertions of hornbook ERISA law;" for example, "that compliance with minimum funding standards for the plans is a statutory requirement, and that [the debtor's] minimum funding obligations accrued daily and would have ceased had the plans been terminated on or after the petition date." *In re White Motor Corp.*, 42 B.R. at 704. The Court found that whether other ERISA issues would arise and be "germane" to the bankruptcy case was based on speculation. Accordingly, the Court found that resolution of those issues was not necessary to a determination of the claims before the bankruptcy court. *In re White Motor Corp.*, 42 B.R. at 705.

In the present case, by contrast, the ERISA issues are concrete, albeit difficult, and are presented in sharp conflict with

---

1. In a memorandum of law filed in the bankruptcy court on January 15, 1987, PBGC acknowledged that the bankruptcy court had jurisdiction over the claims against LTV that it acquired under ERISA. *See* Wagner Affirmation, Exh. 7 at 6. LTV seeks to impose this acknowledgment as a bar to PBGC's attempt to have the issue of when such claims arose for the purposes of § 362(a) of the Code determined by this court. However, acknowledgment by a party that the bankruptcy court has jurisdiction over a given claim does not prevent withdrawal of that claim, since § 157(d) permits mandatory and discretionary withdrawal of *any* proceeding regardless of whether it falls within the bankruptcy court's jurisdiction. Moreover, on the submissions to date, it does not appear that the issue of whether PBGC's claims against LTV arose pre- or post-petition has been squarely presented to the bankruptcy court. Therefore, PBGC's acknowledgment does not impair the timeliness of its present motion to withdraw.

competing provisions of the Code. Withdrawal of this proceeding is mandatory. *Cf. In re Ottawa Cartage, Inc.,* 55 B.R. 371 (N.D.Ill.1985) (mandatory withdrawal of ERISA issues); *The Great Western Sugar Co. v. Interfirst Bank, Dallas, N.A.,* No. 3–85–1755–H, slip op. (N.D.Tex. Nov. 6, 1985) [available on WESTLAW, 1985 WL 17671] (same); *In re Wheeling–Pittsburgh Steel Corp.,* 67 B.R. 735 (W.D.Pa.1985) (same): *In re Air Florida System, Inc. Defined Benefit Pension Plan and Trust,* No. 84–2958, slip op. (S.D. Fla. July 7, 1985) (same).

### Discretionary Withdrawal for Cause under Section 157(d)

■ Where withdrawal of the reference is not deemed to be mandatory, the first sentence of § 157(d) permits a district court to "withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." Although the meaning of "for cause shown" is not free from ambiguity, *see In re DeLorean Motor Co.,* 49 B.R. 900 (Bankr.E.D.Mich. 1985), the presence of significant issues of first impression, considerations of judicial economy, and the need to protect participants in the restored Plans from unduly protracted uncertainty about the status of their benefits together establish sufficient cause for this court to exercise its discretion to withdraw the reference. To deny discretionary withdrawal of a proceeding involving issues of national importance in pension benefit insurance and bankruptcy law that could affect hundreds of thousands of present and future retirees and their employers would effectively erase the margin of discretion allotted to district courts under the statute. Accordingly, LTV's Application can be withdrawn, good cause having been shown.[2]

### Timeliness of PBGC's Petition

Section 157(d) requires that a motion to withdraw the reference be timely. In connection with the earlier petition by PBGC to withdraw the reference of LTV's motion for authorization from the bankruptcy court to enter into the CBA (the "LTV Motion"), Judge Keenan held that PBGC had not timely moved to withdraw. *In re Chateaugay Corp.,* No. 86B 11270, slip op. (S.D.N.Y. July 17, 1987). On August 17, 1987, the Court of Appeals dismissed PBGC's appeal from that order on the grounds that an order granting or denying withdrawal under § 157(d) is not a final appealable order. *In re Chateaugay Corp.,* 826 F.2d 1177 (2d Cir.1987). In opposing the instant withdrawal petition as untimely, LTV relies on Judge Keenan's decision both as the "law of the case" and for the proposition that since PBGC could have anticipated from the outset that ERISA issues would arise in the context of LTV's reorganization, its time for seeking resolution of those issues in the district court has long passed.

Filed on July 8, 1987, the LTV Motion sought a bankruptcy court order authorizing LTV to enter into the CBA, to enter into comparable agreements with other unions, and to make certain other payments to employees and retirees. On July 15, 1987, PBGC moved to withdraw the LTV Motion on the grounds that a determination of the legality of the proposed agreements —which PBGC has characterized as "follow-on" pension plans or payments—would require consideration of certain ERISA provisions. In particular, PBGC argued that the "[p]ension arrangements for which LTV seeks authorization are inconsistent with the provisions of Title IV of ERISA...." *See* Wagner Affirmation, Exh. 2 at 7 ("Declaration of George Weisz"). PBGC contended that "if the LTV Motion is granted, benefits not guar-

---

**2.** Section 4003(f) of ERISA, 29 U.S.C. § 1303(f), provides that a federal district court is the exclusive forum for actions against PBGC by "any person who is a fiduciary, employer, ... and is adversely affected by any action of the [PBGC] with respect to a plan in which such person has an interest...." While it need not be decided whether this provision provides the exclusive forum for such a proceeding as the LTV Application, this section of ERISA is indicative of Congress' intent that the district courts have primary jurisdiction over actions taken by PBGC with respect to pension plans and, therefore, lends further support for the discretionary withdrawal of the reference.

**40**

anteed by PBGC will continue to be paid and benefits will continue to vest and accrue as if [the Plans] had never terminated despite PBGC's decision to take the drastic action of terminating them" under § 4042. *Id.*

In denying the PBGC motion to withdraw on the grounds that it was untimely, Judge Keenan relied on prior submissions and appearances by PBGC in the bankruptcy court that made "clear the PBGC's early recognition of the impact [ERISA] would have in the bankruptcy proceeding." *In re Chateaugay Corp.*, slip op. at 2. The ERISA provisions that PBGC had identified in prior submissions to the bankruptcy court in March and June 1987, however, raised the same issues that were presented to Judge Keenan in PBGC's motion to withdraw: namely, the legality of the "follow-on" payments or plans under ERISA. Judge Keenan's ruling, therefore, concerned the timeliness of PBGC's motion to have those specific issues resolved first by a district court rather than a bankruptcy court.

The LTV interpretation of the effect of Judge Keenan's July 17 order would preclude PBGC from withdrawing *any* proceeding involving *any* ERISA provision because PBGC could have foreseen from the date of filing of LTV's bankruptcy that ERISA issues would arise.[3] To require PBGC to have moved in a district court for a determination of its authority under § 4047 at an earlier date, when restoration was still only one, if that, of several options open to PBGC, would seem to contravene the requirement that the non-Code issues sought to be withdrawn under § 157(d) be non-speculative and necessary to the resolution of the proceeding. *See In re White Motor Corp.*, 42 B.R. at 705.

■ The law of the case doctrine provides that a decision on an issue of law made at one stage of the case should be followed in successive stages of the same

litigation. The doctrine "expresses the general practice of refusing to reopen what has been decided." *Slotkin v. Citizens Cas. Co. of New York*, 614 F.2d 301, 312 (2d Cir.1979), *cert. denied*, 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980). The primary focus of the instant proceeding is the characterization of PBGC's regulatory authority under § 4047 of ERISA. PBGC's authority under § 4047 did not become a substantial and material issue until the September 22 Notice of Restoration was sent to LTV. Therefore, Judge Keenan's July 17 opinion is not binding as to the timeliness of PBGC's present motion to withdraw.

For the foregoing reasons, the motion for withdrawal of the reference is granted. The parties are directed to confer and to arrange with chambers a date for a conference to schedule further proceedings.

IT IS SO ORDERED.

---

3. In this regard, the court notes that the LTV Motion was granted by the bankruptcy court in an order entered on July 30, 1987. Thereafter, the ERISA issues which Judge Keenan declined to withdraw became the subject of an appeal by PBGC to Judge Sand. As described above, when

PBGC withdrew its appeal without prejudice, Judge Sand retained jurisdiction to hear PBGC's ERISA-based objections to the CBA Order in the event that those issues are not resolved in proceedings on the LTV Application which by today's decision is withdrawn to this court.